UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SABRINA ROLDAN,

                    Plaintiff,

            v.

ADOLFO LEWIS *et al.*,

                    Defendant.

—————————————————————

CITY OF NEW YORK,

                    Third-Party Plaintiff,

            v.

LEXINGTON INSURANCE CO. and
PHILADELPHIA INDEMITY INSURANCE
CO.,

                    Third-Party
                    Defendants.

**MEMORANDUM & ORDER**
20-CV-03580 (HG) (MMH)

**HECTOR GONZALEZ**, United States District Judge:

        Plaintiff Sabrina Roldan sued the City of New York and various organizations and

individuals involved with her treatment in foster care between May 1997 and February 2012.

*See* ECF No. 186 ¶¶ 41, 175 (Underlying Second Amended Complaint, "SAC").  In this third-

party action, Third-Party Plaintiff the City of New York sues Lexington Insurance Co. and

Philadelphia Indemnity Insurance Co., insurers of the two at-issue foster care agencies in the

underlying action, seeking, among other relief, a declaration that Lexington and Philadelphia

have a duty to defend the City in that action.  For the reasons explained herein, the City's motion

is granted in part, and Lexington and Philadelphia have a duty to defend it.

# BACKGROUND

### A.  The Underlying Action

As will be discussed further below, Ms. Roldan's allegations cover a long period and vary in their specificity.  There are, however, a few key waypoints needed to establish the relevant timeline.  Ms. Roldan was born in 1992 and the City took her and her two siblings into custody in 1997 because Ms. Roldan's mother abandoned them and her father could not care for them.  SAC ¶¶ 8, 41–42.  The City placed Ms. Roldan into the custody of Concord Family Services, which the City contracted with to provide foster care services.  *Id.* ¶¶ 14h, 43.  In October 1997, Concord moved Ms. Roldan into the foster home of Juan and Maria Rodriguez.[1] *Id.* ¶ 44.  Ms. Roldan alleges that she experienced severe sexual and physical abuse and neglect at the hands of the Rodriguezes.  *Id.* ¶¶ 46–59, 80–81, 83.  In 2002, Concord moved Ms. Roldan out of the Rodriguez home.  *Id.* ¶ 83.

When Ms. Roldan was ten years old, Concord moved her into the home of Debra Shields. *Id.* ¶ 85.  Ms. Roldan claims that the City had previously confirmed that Ms. Shields had abused or maltreated other children in her home.  *Id.* ¶ 87.  Concord had already placed two other male foster children there by the time it moved in Ms. Roldan and her siblings.  *Id.* ¶ 88.  Ms. Roldan alleges that one of those boys, among other illegal acts, tried to rape her, and that Ms. Shields "pushed and physically assaulted [her] to punish [her] for the incident."  *Id.* ¶¶ 91–94.  In November 2003, Plaintiff was placed in her fourth foster home, and she alleges that between May 1997 and December 2008, Concord placed her in more than ten different foster homes.  *Id.* ¶¶ 96–97.  Ms. Roldan claims that the City terminated its contract with Concord in "late 2008"

---

[1]      The Court includes the names of specific foster parents only for convenience and consistency with the SAC.  To be clear, none of these individuals is a Defendant in the underlying action, and the Court expresses no view as to any potential liability on their part.

due to "gross mismanagement, fiscal impropriety including the misuse of government funds, and criminal activity," and that the City subsequently placed her into the custody of HeartShare Human Services of New York and Heartshare St. Vincent's Services (together, "HeartShare"), which she alleges "was one of the most dangerous foster care agencies in the City." *Id.* ¶¶ 99–101. As with Concord, the City contracted with HeartShare to provide foster care services. *Id.* ¶ 14h.

In December 2008, HeartShare moved Ms. Roldan into Kiesha Bell's "filthy," "malodorous," and "overcrowded" home, which "adult men . . . would enter and leave throughout the night." *Id.* ¶¶ 103–06. Sometime thereafter, Ms. Roldan fled the Bell home and went to stay with her brother in the home of Gary Hoyte, where she remained "with the knowledge and approval" of the City and HeartShare. *Id.* ¶¶ 108–09. According to Ms. Roldan, Mr. Hoyte was a "sexual predator" and HeartShare knew it. *Id.* ¶ 111. He "subjected [her] to sexual abuse and sexual harassment for a period of approximately six months." *Id.* ¶ 113. In 2009, HeartShare moved Ms. Roldan into the home of Dolores Shore, where Ms. Roldan alleges that she was "sexually assaulted and terrorized on multiple occasions" by Ms. Shore's adult son, Max Shore, who also lived there. *Id.* ¶¶ 123–24. Ms. Roldan alleges that Mr. Shore tried to rape her, and that he and his girlfriend "regularly subjected [her] to sexual harassment and sexual threats." *Id.* ¶ 127. Eventually, the City and HeartShare moved Ms. Roldan out of the Shore home, but "left all of [her] possessions and all of [her] documents, including [her] birth certificate" behind. *Id.* ¶ 130. She was then placed back into the Bell home, where she claims she was again "mistreat[ed] and endanger[ed]," and into "numerous other foster homes" after that. *Id.* ¶¶ 131–32. Later, Ms. Roldan was placed into Helen Lacy's home, which had up to ten other children in it, as well as Ms. Lacy's former boyfriend, who had been charged with murder.

*Id.* ¶¶ 133–35.  Eventually, Ms. Roldan was moved out of the Lacy home and into other foster

homes; in total, HeartShare moved her to more than ten foster homes.  *Id.* ¶¶ 138–39.

Ms. Roldan signed herself out of foster care and left the City's custody on February 10, 2012.

*Id.* ¶¶ 141, 175.  Until that point, she had remained in the custody of the City and under

HeartShare's care.  *Id.* ¶  176.

Based on the above conduct and more not summarized here, Ms. Roldan alleges that she

"suffered severe sexual, physical[,] and emotional abuse, in gross disregard of her constitutional,

statutory, and common law rights."  *Id.* ¶ 1.  Among those she seeks to hold liable are the City,

Concord, and HeartShare.  *Id.* ¶¶ 6–7.  As will also be discussed in further detail below,

Ms. Roldan alleges numerous injuries, including "irreversible and permanent" "extraordinary

physical and mental injuries, pain and suffering, anguish, terror, confusion, and helplessness,"

but also "loss of funds" and the lost opportunity to continue her education.  *Id.* ¶¶ 140, 171, 225.

### B.  The Third-Party Action

After Ms. Roldan initiated the underlying action, the City filed a Third-Party Complaint

against Lexington and Philadelphia.  *See* ECF No. 22 (Third-Party Complaint).  At different

points, Lexington insured Concord and Philadelphia insured Heartshare.  *See id.* ¶¶ 36, 44.

Lexington issued a variety of insurance policies to Concord, providing coverage between July

2003 and July 2010.  ECF No. 134 at 9–10 (City's Rule 56.1 Statement and Counterstatement).[2]

These included general liability ("GL") policies for the periods July 1, 2003, to July 1, 2004

("2003 Policy"); July 1, 2004, to July 1, 2005 ("2004 Policy"); and July 1, 2005, to July 1, 2006.

("2005 Policy").  *See id.* at 9.  Lexington also issued primary policies, which included GL and

professional liability ("PL") parts, for the periods July 1, 2006, to July 1, 2007 ("2006 Policy");

---

[2]        The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

July 1, 2007, to July 1, 2008 ("2007 Policy"); July 1, 2008, to July 1, 2009 ("2008 Primary Policy"); and July 1, 2009, to July 1, 2010 ("2009 Policy").  *See id.* at 9–10.  In addition, Lexington issued to Concord an umbrella policy[3] for the period July 1, 2008, to July 1, 2009 ("2008 Umbrella Policy").  *See id.* at 10.  In September 2020, the City requested that Lexington defend it in the underlying action as an alleged additional insured[4] under policies issued to Concord.  *See id.* at 8–9.  On January 8, 2021, AIG, acting as claims administrator for the policy, informed the City "that there is no coverage for the [underlying action]" under the 2006 and 2007 Policies.  *See* ECF No. 134-3 at 2 (January 8, 2021, Letter from AIG to the City); ECF No. 134 at 9 (identifying the relevant policies).

Philadelphia also issued various primary liability policies to HeartShare from August 31, 2007, to May 1, 2016.  *See* ECF No. 134 at 13.  Specifically, the Philadelphia policies covered the following periods:  August 31, 2007, to August 31, 2008; August 31, 2008, to August 31, 2009; August 31, 2009, to August 31, 2010; August 31, 2010, to August 31, 2011; August 31, 2011, to August 31, 2012; August 31, 2012, to August 31, 2013; August 31, 2013, to August 31, 2014; May 1, 2014, to May 1, 2015; and May 1, 2015, to May 1, 2016.  *See id.* at 13.  On September 28, 2020, Philadelphia informed HeartShare that it would defend its insured and its

---

[3]     "Primary insurance policies provide the first layer of insurance coverage," while "[u]mbrella insurance policies provide excess insurance," or "an additional layer of coverage after a predetermined amount of primary coverage has been exhausted."  *See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 957 F.3d 337, 340 (2d Cir. 2020).  Unless noted, case law quotations in this Order accept all alterations and omit internal quotation marks, citations, and footnotes.

[4]     An "additional insured" provision extends insurance coverage to an entity other than the named insured, and it "enjoy[s] the same protection as the named insured."  *See Kassis v. Ohio Cas. Ins. Co.*, 913 N.E.2d 933, 934 (N.Y. 2009) (emphasis omitted).  The purpose of such a provision is to "protect additional insureds from vicarious liability for the named insured's negligence."  *See Ohio Sec. Ins. Co. v. Travelers Indem. Co. of Conn.*, No. 19-cv-1355, 2021 WL 797670, at *3 (S.D.N.Y. Mar. 1, 2021).

employees in the underlying action under the "Sexual Abuse or Molestation Vicarious Liability Coverage Form ('SPAM Form') only of" the "2011-2012 Primary Policy" issued to Heartshare. *See* ECF No. 112-6 at 3 (Sept. 28, 2020, Letter from Philadelphia to Heartshare); *see also* ECF No. 112-4 at 58 (2011-2012 Primary Policy Issued by Philadelphia, "2011-2012 Primary Policy"). Setting the SPAM form aside, the 2011-2012 Primary Policy stated that Philadelphia, under circumstances described in the insurance agreement, "w[ould] pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *See* ECF No. 112-4 at 13. The 2011-2012 Primary Policy also contained an exclusion—the Abuse or Molestation Exclusion ("Abuse Exclusion")— which made clear that the insurance did not cover "'bodily injury,' 'property damage,' or 'personal and advertising injury' arising out of" (1) "[t]he actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured," or (2) the negligent employment, investigation, supervision, reporting to the proper authorities (or failure to so report), or retention "of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by" the conduct in the preceding paragraph one. *Id.* at 38. The insurance policy listed the New York City Administration for Children's Services as an additional insured, *id.* at 7, but Philadelphia "disclaim[ed] coverage to the City for the [underlying] action" under the 2011-2012 Primary Policy, *see* ECF No. 112-6 at 3 n.1.

In this third-party action, the City seeks a declaration that Lexington and Philadelphia have a duty to defend it in the underlying action and pay its attorney's fees and costs[5] incurred in

---

[5]     This requested relief is encompassed by the Court's conclusion concerning the insurers' duty to defend because "the duty to defend is triggered by the filing of a complaint containing allegations that could possibly bring the action within the scope of coverage provided by the insurance policy." *See Smart Style Indus., Inc. v. Penn. Gen. Ins. Co.*, 930 F. Supp. 159, 163

defending that action based on its alleged status as an additional insured.  ECF No. 22 ¶¶ 1, 17, 24.  Philadelphia answered and filed a crossclaim seeking a declaration that Lexington's insurance policies "were in effect for some or all of the time period" of the underlying action.  *See* ECF No. 32 at 14 (Philadelphia's Answer, Crossclaim, and Counterclaim).  Philadelphia also counterclaimed, seeking a declaratory judgment that it has no duty to defend nor indemnify the City in the underlying action, among other relief.  *See id.*  Lexington filed an answer to the City's Third-Party Complaint, *see* ECF No. 39, and to Philadelphia's crossclaim, *see* ECF No. 41.

On May 17, 2023, Philadelphia filed a motion for summary judgment, asking the Court to rule that it has no duty to defend the City in the underlying action.  *See* ECF No. 123 (Philadelphia's Memorandum of Law).  On the same day, Lexington filed a summary judgment motion seeking dismissal of the City's claim and Philadelphia's crossclaim.  *See* ECF No. 126-15 (Lexington's Memorandum of Law).  On June 16, 2023, the City similarly filed a motion for summary judgment on its claims that Philadelphia and Lexington each have a duty to defend it. *See* ECF No. 136 (City's Memorandum of Law).  Philadelphia and Lexington filed Oppositions on July 14, 2023.  *See* ECF No. 142 (Philadelphia's Opposition); ECF No. 143 (Lexington's Opposition).  The City did the same on August 3, 2023.  *See* ECF No. 144 (City's Opposition).

On November 22, 2023, Ms. Roldan filed an Amended Complaint, which contained several new claims, *see* ECF No. 145 (Underlying First Amended Complaint, "FAC"), and on December 6, 2023, the City and certain other Defendants in the underlying action filed a motion

---

(S.D.N.Y. 1996).  The City must be reimbursed for the fees and costs of defending the underlying action.  *See Turner Constr. Co. v. Am. Mfrs. Mut. Ins. Co.*, 485 F. Supp. 2d 480, 490 (S.D.N.Y. 2007) (where defendants "breached their duty to defend" additional insured, defendants were ordered to reimburse the additional insured for "reasonable attorneys' fees and necessary costs incurred by [the additional insured] in the defense of the underlying action[]"), *aff'd sub nom.*, *Turner Constr. Co. v. Kemper Ins. Co.*, 341 F. App'x 684 (2d Cir. 2009).

to strike the FAC as not filed in conformity with Rule 15, *see* ECF No. 146.  On the next day, the Court entered an order requiring Ms. Roldan to explain why the FAC was procedurally proper and directed the Third-Party Litigants to file a letter "describing their respective positions on how, if at all, the claims in [the FAC] affect the [third-party] insurance dispute."  *See* Dec. 7, 2023, Text Order.  On December 20, 2023, Philadelphia filed its letter, representing that FAC "generally d[id] not affect" its position.  *See* ECF No. 160 at 1.  Philadelphia also sought leave to file a supplemental brief in the event that the Court deemed the FAC operative.  *Id.* at 1–2.  On the same day, the City took the same position as Philadelphia, stating that the FAC "d[id] not materially affect the facts or law necessary to resolve the summary judgment[] motions [in the third-party action] in their present form."  *See* ECF No. 161 at 1.  On January 19, 2024, Lexington adopted the same view.  *See* ECF No. 176.

On March 18, 2024, the Court ruled that the FAC was proper under Rule 15(a)(1)(B) and denied the motion to strike it.  *See* Mar. 18, 2024, Text Order.  The Court also directed Ms. Roldan to file the SAC "to cure defects with respect to her allegations of diversity jurisdiction."  *Id.*  In addition, the Court granted Philadelphia's request for supplemental briefing concerning the effect of amendment on the instant summary judgment motions.  *See id.* Ms. Roldan filed the SAC on March 20, 2024.  *See* ECF No. 186.  Philadelphia filed its supplemental brief on April 8, 2024, describing the differences in the SAC as "inconsequential" to the insurance coverage dispute.  *See* ECF No. 191 at 4 (Philadelphia's Supplemental Brief). Lexington took the same view.  *See* ECF No. 192 at 5 (Lexington's Supplemental Brief).  On April 15, 2024, the City filed a letter motion in which it claimed that the insurers' Supplemental Briefs went beyond the question presented by the Court concerning the effect of the SAC on the third-party insurance dispute.  *See* ECF No. 194 (City's Second Motion to Strike).  On the same

day, Philadelphia also filed an Opposition to Lexington's Supplemental Brief, arguing that Lexington has a duty to defend the City.  *See* ECF No. 195 (Philadelphia's Supplemental Opposition Brief).  The Court entered an Order on April 15, 2024, in which it stated that it would construe the City's Second Motion to Strike as its Opposition to the insurers' Supplemental Briefs.  *See* Apr. 15, 2024, Text Order.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The moving party has the burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  In deciding a summary judgment motion, any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party.  *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir. 1995).

The Court has "broad discretion" to decline to exercise jurisdiction under the Declaratory Judgment Act and its exercise of jurisdiction is guided by the following considerations "to the extent they are relevant" in this case:

> (1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether such a judgment would

finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins. Co. v. Niagara Transformer Co.*, 57 F.4th 85, 99–100 (2d Cir. 2023).  "[C]ourts may issue a declaratory judgment on the duty to defend, while holding that the duty to indemnify is not ripe for adjudication."  *See Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 261 (S.D.N.Y. 2013).

## DISCUSSION

"Under New York law, an insurer's duty to defend policyholders is 'exceedingly broad,' and 'broader than the . . . duty to indemnify.'"  *See Travelers Indem. Co. v. Harleysville Ins. Co.*, No. 21-cv-1089, 2023 WL 6214239, at *7 (E.D.N.Y. Sept. 25, 2023) (quoting *Atl. Ave. Sixteen AD, Inc. v. Valley Forge Ins. Co.*, 56 N.Y.S.3d 207, 209 (N.Y. App. Div. 2017)).[6]  "An insurer may refuse to defend only if it could be concluded as a matter of law that there is no possible factual or legal basis on which the insurer might eventually be obligated to indemnify the insured under any provision of the insurance policy."  *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 82 (2d Cir. 2013).  To be sure, the duty to defend "is not an interminable one."  *Harleysville*, 2023 WL 6214239, at *7.  But "[i]f the complaint contains any facts or allegations which bring the claim even potentially within the protection purchased, the insurer is obligated to defend."  *See Technicon Elecs. Corp. v. Am. Home Assur. Co.*, 542 N.E.2d 1048, 1050 (N.Y. 1989).  Accordingly, "[w]here several claims arise from the same set of facts, if any of the claims

---

[6]     The parties agree that New York law controls this dispute, which is "sufficient to establish choice of law."  *See Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566–67 (2d Cir. 2011).

are covered by the policy, the insurer consequently has a duty to defend the entire action under any of the policies, including the uncovered claims." *CGS*, 720 F.3d at 83; *see also Great Am. Ins. Co. v. Houlihan Lawrence, Inc.*, 449 F. Supp. 3d 354, 365 (S.D.N.Y. 2020) ("The insurer's duty to defend the entire action is triggered even if only one claim is potentially covered by the insurance policy.").

"To determine if a defense obligation exists, courts compare the allegations of the complaint to the terms of the policy." *Houlihan*, 449 F. Supp. 3d at 365.  As such, the Court must "liberally construe[]" the SAC's allegations, *see Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 83 (2d Cir. 2006), and interpret the insurance policies according to the "ordinary rules of contractual interpretation," *see Houlihan*, 449 F. Supp. 3d at 366.  That being said, the "allegations in the complaint are not necessarily the '*sole* criteria for measuring the scope of the duty to defend.'" *Id.* (quoting *Fitzpatrick v. Honda Am. Motor Co.*, 575 N.E.2d 90, 92 (N.Y. 1991) with alterations accepted).  Indeed, "[t]he New York Court of Appeals has eschewed wooden application of the four corners of the complaint rule," in favor of a rule requiring the insurer to also provide a defense where, notwithstanding the complaint allegations, underlying facts made known to the insurer create a reasonable possibility of coverage." *See QBE Ins. Corp. v. Adjo Contracting Corp.*, 997 N.Y.S.2d 425, 440–41 (N.Y. App. Div. 2014).

After determining whether there is coverage under the relevant policy, the Court may consider if any exclusions raised by the insurer bar coverage.  *See Vill. of Piermont v. Am. Alt. Ins. Co.*, 151 F. Supp. 3d 438, 451 (S.D.N.Y. 2015).  Where an insurer invokes a policy exclusion to try to avoid its duty to defend, it "bears the heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion." *Stein v. N. Assur. Co. of Am.*, 617 F. App'x 28, 30 (2d Cir. 2015).  In other words, for an exclusion to apply, "the

11

insurer must demonstrate that the allegations of [the] underlying complaint place that pleading solely and entirely within the exclusions of the policy and . . . the allegations are subject to no other interpretation." *CGS*, 720 F.3d at 77.

### A.     *Philadelphia Has a Duty to Defend the City*

Although Philadelphia's insured, HeartShare, took custody of Ms. Roldan after the City ended its relationship with Lexington's insured, Concord, the Court begins its analysis with Philadelphia's claims.  This is because Philadelphia's attempt to disclaim coverage touches on certain first principles of New York insurance law which are also instructive for the duty to defend analysis as it relates to Lexington's effort to do the same.

### i.     At-Issue Policies

At the threshold, the Court must determine the universe of relevant Philadelphia policies. In the Third-Party Complaint, the City asserts that Philadelphia has a duty to defend under "a series of commercial [GL] and [PL] policies that were effective for some or all of the period of the [underlying] action."  ECF No. 22 ¶¶ 22, 60.  Although Philadelphia issued various policies to HeartShare during the period covered by the underlying complaint, Philadelphia asserted in its Rule 56.1 Statement attached to its pre-motion conference letter that "[t]he Philadelphia policy at issue in the City['s] third-party complaint . . . is Policy No. PHPK765993," or the 2011-2012 Primary Policy, ECF No. 112-1 ¶¶ 1–2 (Philadelphia's Rule 56.1 Statement), which was the specific policy under which Philadelphia disclaimed coverage, ECF No. 112-6 at 3 n.1. Philadelphia observes that the City failed to contravene its Rule 56.1 Statement.  *See* ECF No. 123 at 8.  The City retorts that under Local Rule 56.1, it was not obligated to do so at the pre-motion conference letter phase but only at the instant motion stage, when it did file a counterstatement.  *See* ECF No. 136 at 50; ECF No. 134.

Although both sides devote much briefing to this issue, they lose the forest for the trees. Philadelphia argues that the statement regarding the at-issue policy in its Rule 56.1 Statement is "deemed admitted," and that, accordingly, the 2011-2012 Primary Policy is the "only Philadelphia policy at issue in this litigation." ECF No. 123 at 8. For that proposition, it relies on cases in which courts have deemed admitted uncontroverted Rule 56.1 statements. *See id.* (citing, *inter alia*, *Cason v. Doe 1–2*, No. 16-cv-3710, 2018 WL 10610345, at *1 (E.D.N.Y. Nov. 27, 2018)). To be sure, Local Rule 56.1(c) warns litigants that failure to oppose another party's statement in accordance with the rule will result in that uncontroverted fact being "deemed . . . admitted." But Philadelphia's position does not fully capture the law of this Circuit, which makes clear that the Court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules," *see Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001),[7] and that there is a "strong preference for resolving disputes on the merits, rather than on the basis of procedural issues," *see Fiedler v. Incandela*, 222 F. Supp. 3d 141, 156 (E.D.N.Y. 2016).

The City also misses the mark on this point. As it ultimately concedes, *see* ECF No. 144 at 25, a nonmovant needs to contravene its adversary's Rule 56.1 Statement at the pre-motion conference letter phase. *See* Individual Practices, § IV.A.4. (discussing opposing Rule 56.1 Statements in the context of pre-motion conference letters). However, in light of the foregoing discussion and because the Court can appropriately adjudicate this issue on the merits, it is inappropriate to apply the automatic rule urged by Philadelphia to this case. That being said, and

---

[7]     Indeed, Philadelphia's own authority, *see* ECF No. 123 at 8, recognizes the Court's discretion in this area. *See Taylor & Fulton Packing, LLC v. Marco Int'l Foods, LLC*, No. 09-cv-2614, 2011 WL 6329194, at *4 (E.D.N.Y. Dec. 16, 2011) ("A nonmoving party's failure to respond to a Rule 56.1 statement *permits* the court to conclude that the facts asserted . . . are uncontested and admissible." (emphasis added)).

as the City recognizes, *see* ECF No. 144 at 26, it still has a burden to demonstrate that it is

entitled to summary judgment. *See Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)

(regardless of opposition, court must still satisfy itself that moving party has carried its burden

under Rule 56). And with respect to the realm of applicable Philadelphia policies, the City's

position is confused and confusing. In the Third-Party Complaint, the City seeks a declaration

with respect to all relevant Philadelphia policies. *See* ECF No. 22 ¶ 60. Then, in its Rule 56.1

Counterstatement, it vaguely states that "[a]ll of Philadelphia['s] policies issued to Heartshare

are 'at issue,' *depending on* the year in which an occurrence is alleged to have taken place."

ECF No. 134 at 14 (emphasis altered). The City also references a letter in which Ms. Roldan

clarified that she allegedly experienced abuse between July 1, 2008, and February 28, 2009, *see*

ECF No. 134-1, which the City claims "*potentially* places each of the . . . Policies 'at issue.'"

ECF No. 134 at 14 (emphasis added). Then, in its instant motion, the City suggests that only

four policies (spanning August 31, 2008, to August 31, 2012) are "relevant," ECF No. 136 at 19,

before later claiming in that same motion that "Philadelphia must defend the City under all

nine . . . Philadelphia primary policies as Ms. Roldan has alleged an injury during all of them,"

*id.* at 39.

A moving party may not be a moving target. This is particularly true in the context of an

action for a declaratory judgment, a mechanism designed to "offer relief from uncertainty." *See*

*Admiral*, 57 F.4th at 100. Thus, where the parties "talk past one another," as here, it is

appropriate for the Court to isolate "the facts that are not in dispute" and rule accordingly. *See,*

*e.g.*, *Britt v. Thermald Realty I, LP*, No. 13-cv-8289, 2015 WL 4922977, at *10 (S.D.N.Y. Aug.

18, 2015). In this case, Philadelphia effectively concedes that, before analyzing any possible

exclusions, there is coverage for at least some of Ms. Roldan's claims under the 2011-2012

Primary Policy.[8]  Accordingly, the Court will accordingly limit its analysis to that policy. However, as discussed further below, this narrowed analysis has no effect on the Court's bottom-line conclusion that Philadelphia has a duty to defend.[9]

ii.      Coverage Under the 2011-2012 Primary Policy

As it relates to the threshold question of coverage under the 2011-2012 Primary Policy, there is little in dispute, and even less in serious dispute.  Philadelphia has conceded that the City is an additional insured under the policy.  *See* ECF No. 85 at 34:13–14 (Dec. 10, 2021, Conf. Tr.); ECF No. 112-4 at 13; *see also* ECF No. 112-1 ¶ 5; ECF No. 134 at 14.  Philadelphia also does not seriously contest that the SAC's allegations come within the 2011-2012 Primary Policy's scope, proceeding directly to the analysis of an exclusion in its motion.  *See* ECF No. 123 at 16.  That makes sense because the 2011-2012 Primary Policy applies to "'bodily injury' or 'property damage' . . . caused by an occurrence," which is, in turn, defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See* ECF No. 112-4 at 26, 33.  The allegations against the City related to Ms. Roldan's time in HeartShare's custody are replete with such allegations.  *See, e.g.*, SAC ¶¶ 136–37 (alleging that the City and HeartShare took "no action" even after Ms. Roldan "begged" them to remove her from Ms. Lacy's home because she was "terrified"); *id.* ¶ 140 (alleging that "[b]ecause of the frequency of the moves and the abuse [Ms. Roldan] suffered, [she] was unable to continue her education"); *id.* ¶ 170 ("As a result of defendants' failures, [Ms. Roldan] was subjected to

---

[8]      As discussed further below, Philadelphia briefly suggests the possibility that certain claims are not covered by the 2011-2012 Primary Policy, but that argument fails.

[9]      To be clear, the Court does not conclude that Philadelphia has no duty to defend under any of the other policies, only that the City has not carried its burden on summary judgment to obtain that additional relief due to the uncertainty around its position.

15

repeated sexual, physical, and emotional abuse, and was denied adequate food, clothing, and shelter.").

Although Philadelphia does not specifically raise the issue, the fact that Ms. Roldan's allegations are imprecise with respect to timing does not relieve it of its duty to defend. Ms. Roldan's allegations are sufficient to "arguably fall within a risk covered by the policies." *See Scottsdale Ins. Co. v. United Indus. & Constr. Co.*, 137 F. Supp. 3d 167, 175 (E.D.N.Y. 2015). "[A] policy protects against poorly or incompletely pleaded cases," *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 422 N.E.2d 518, 521 (N.Y. 1981), and that principle extends to a "complaint that is so vague and indefinite that one cannot conclusively rule out coverage," *see United*, 137 F. Supp. 3d at 178 (quoting *Cohen v. Jacoby*, 199 N.Y.S.2d 537, 539–40 (N.Y. Sup. Ct. 1960)); *see also New York v. Blank*, 27 F.3d 783, 790 (2d Cir. 1994) ("[W]here the allegations of the underlying complaint are general, ambiguous, or inaptly phrased, courts construe the allegations in favor of coverage."). In this case, *United* is instructive. There, the court held that an insurer could not "disclaim its duty to defend . . . based on controlling dates of the policies" in view of the "broad pleadings in the [u]nderlying [a]ctions which fix the dates of [the insured's] actions in, around, and on the 'cusp' of each of the[] policies." 137 F. Supp. 3d at 178 n.6. So too here, where the Court "cannot . . . ascertain[] with certainty" that no covered act in the broad SAC falls within policy period for the 2011-2012 Primary Policy.[10] *Id.*

Philadelphia also suggests that the definition of "occurrence" precludes coverage for certain claims. Specifically, it argues that the 2011-2012 Primary Policy "does not provide coverage for Roldan's breach of contract cause of action and causes of action for violations of

---

[10]     That is to say nothing of the potential applicability of one of the earlier Philadelphia policies, which, for reasons previously explained, the Court cannot address here due to imprecision in the parties' briefing.

the Fourteenth Amendment and the New York State Constitution because these causes of action do not constitute an 'occurrence.'"  *See* ECF No. 191 at 10–11; *see also* ECF No. 123 at 23. However, Philadelphia provides only weak support for that position by citing cases in which courts held that breach of contract claims fell outside of the definition of "occurrence."  *See* ECF No. 123 at 24.  Further, to the extent Philadelphia is trying to disclaim coverage for certain claims, it is black-letter law that "the duty to defend [is] a binary proposition:  either the insurer has a duty to defend, in which case it must defend the entire lawsuit, or the insurer has no duty to defend the lawsuit at all."  *See Spandex House, Inc. v. Hartford Fire Ins. Co.*, 407 F. Supp. 3d 242, 260 (S.D.N.Y. 2019).  Philadelphia seems to try do here precisely what the law does not allow and "provide a defense for some claims in [the] lawsuit but not others."  *Id.*; *accord Houlihan*, 449 F. Supp. 3d at 365–66.  After all, "[t]he duty to defend . . . . includes the defense of those actions in which alternative grounds are asserted, even if some are without the protection purchased."  *Ruder & Finn*, 422 N.E.2d at 521.  Thus, even if Philadelphia is right and it is not ultimately obligated to indemnify the City for certain specific claims, that argument does nothing to change the conclusion that it has a duty to defend the City.

iii. <u>Attacks on the Merits of the Underlying Action</u>

Having effectively conceded that at least some allegations come within the 2011-2012 Primary Policy's coverage, Philadelphia advances two categories of arguments to avoid its duty to defend.  First, it claims that coverage for the underlying action is "entirely precluded" under the 2011-2012 Primary Policy's Abuse Exclusion.  *See* ECF No. 191 at 8.  Second, it presents several arguments attacking the merits of Ms. Roldan's allegations in the underlying action.  *See, e.g.*, ECF No. 123 at 6.  Neither argument is convincing.

The Court starts with Philadelphia's second argument that certain of Ms. Roldan's allegations fail, which misapprehends first principles of New York law.  Philadelphia claims that Ms. Roldan's Section 1983 claims are time-barred and were not permitted by New York's Child Victims Act ("CVA"), *see* ECF No. 123 at 20–23, "which revive[d] the time to commence [certain] civil actions based upon sexual offenses," *see Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 104 (2d Cir. 2023).  Philadelphia also contends that Ms. Roldan "has no authority under the CVA to assert a breach of contract cause of action."  *See* ECF No. 123 at 24–25.  In its most recent submission filed in response to the SAC, Philadelphia reaches further, arguing that neither the CVA nor New York's Adult Survivors Act provides a standalone cause of action. ECF No. 191 at 4–5.  Philadelphia also claims it "has no duty to defend the City in the [underlying] [a]ction because the allegations in [Ms. Roldan's] Complaint, if proven true, would *not* impose a duty to indemnify on the part of Philadelphia for the reasons set forth in pages 15 to 18 of Philadelphia's opening [brief]," *see* ECF No. 142 at 13, thereby referring back to its arguments about why the underlying Section 1983 claims fail, *see* ECF No. 123 at 20–23. Remarkably, Philadelphia—an insurance company—even claims, in this duty to defend posture, that "the Court must dismiss" certain causes of action advanced by Ms. Roldan "because they are not legally viable."  *See* ECF No. 191 at 9.  Although Philadelphia does not explicitly say as much, it suggests that where an underlying plaintiff's claims fail, there will be no coverage, and "where there is no coverage . . ., there is no duty to defend any insured."  ECF No. 123 at 22–23 (quoting *Atl. Cas. Ins. Co. v. Stone & Tile, Inc.*, No. 17-cv-5534, 2021 WL 8316280, at *7 (E.D.N.Y. Aug. 26, 2021)).

The fatal flaw in Philadelphia's argument is that it equates its insured's potential liability in the underlying action with its own duty to defend.  The City is right to observe that

Philadelphia's view contravenes elementary principles of New York insurance law, *see* ECF No. 136 at 39, a cornerstone of which is that the duty to defend is much broader than the duty to indemnify. *See Harleysville*, 2023 WL 6214239, at *7.[11]  Further, "the New York Court of Appeals . . . [has] squarely reject[ed] the argument that 'liability must be determined before an additional insured is entitled to a defense.'"  *See Certain Underwriters of Lloyd's, London v. Travelers Cas. Ins. Co. of Am.*, 664 F. Supp. 3d 288, 293 (E.D.N.Y. 2023) (quoting *BP Air Conditioning Corp. v. One Beacon Ins. Grp.*, 871 N.E.2d 1128, 1132 (N.Y. 2007)).  Philadelphia's argument is misguided because "[t]he merits of the complaint are irrelevant; if the allegations suggest coverage, 'the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be.'"  *Id.* (quoting *Ruder & Finn*, 422 N.E.2d at 521).  Indeed, as the Second Circuit has explained, "[t]he New York cases establish that so long as the claims asserted against the insured may rationally be said to fall within policy coverage, *whatever may later prove to be the limits of the insurer's responsibility to pay*, there is no doubt that it is obligated to defend."  *See Century 21*, 442 F.3d at 83.

Philadelphia resists this outcome by repeating the uncontroversial principle that "when the uncontroverted facts prove that no duty to indemnify exists the insurer must be relieved of its duty to defend."  *See* ECF No. 123 at 25 (quoting *Md. Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 160 (2d Cir. 2003)).  In other words, "if it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer will be obligated to indemnify the insured," then an insurer owes no duty to defend. *Continental*, 332 F.3d at 160.  But

---

[11]     After Philadelphia filed its instant motion, Plaintiff Roldan filed a letter urging the Court to "not reach the merits of [Ms. Roldan's] claims against Defendants in ruling on a Third Party's Motion in a Third-Party Action."  ECF No. 132 (Plaintiff Roldan's Opposition to Philadelphia's Motion for Summary Judgment).  As explained herein, her argument is well taken.

Philadelphia misses the point by focusing on the merits of Ms. Roldan's claims rather than on the contours of the coverage provided by the policies it sold.  For example, in *Stone & Tile*, *see* ECF No. 123 at 22–23, the court indeed held that the insurer had no duty to defend.  2021 WL 8316280, at *7.  However, it did so where an insured sought a defense under a premises liability policy in a case involving injuries not even sustained at the insured building but at an altogether different one.  *See id.*  Similarly, in *MIC General Insurance Co. v. Allen*, *see* ECF No. 142 at 13, the Second Circuit ruled that there was no duty to defend where a homeowner's policy covered only a residence where the insured resided, and it was undisputed that the insured did not actually reside at the at-issue property.  697 F. App'x 717, 719–20 (2d Cir. 2017).

In sum, the cases relied on by Philadelphia are inapposite because they involved instances in which the underlying claims "were outside the coverage of the policies at issue."  *See Burt Rigid Box, Inc. v. Travelers Prop. Cas. Co.*, 302 F.3d 83, 97 (2d Cir. 2002) (cited by Philadelphia, ECF No. 142 at 13–14).  They do not, as Philadelphia would have it, stand for the proposition that the broad duty to defend is extinguished when the claims in the underlying lawsuit against the insured may ultimately be doomed.  This conclusion is consistent with the case law, under which there is a duty to defend even where the underlying claims are "untenable."  *See Century 21*, 442 F.3d at 82; *see also Ruder & Finn*, 422 N.E.2d at 521 ("[T]he question is not whether the complaint can withstand a motion to dismiss . . . .").  As such, Philadelphia's attack on Ms. Roldan's claims cannot relieve it of its duty to defend because it cannot at all "eliminate the possibility" of coverage in the underlying action.  *See Stein*, 617 F. App'x at 31.

iv.      Applicability of the Abuse Exclusion

Moving to Philadelphia's more serious argument, it claims that it has no duty to defend because the SAC's allegations all fall within the Abuse Exclusion.  *See* ECF No. 123 at 16.  As previously explained, that exclusion provided that the 2011-2012 Primary Policy did not cover "'bodily injury,' 'property damage,' or 'personal and advertising injury' arising out of . . . [t]he actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured."  ECF No. 112-4 at 38.  Philadelphia posits that this Abuse Exclusion applies because Ms. Roldan was in the City's care, custody, and control as a foster child, and that "each and every cause of action relates to and seeks relief for 'sexual, physical and emotional abuse.'"  *See* ECF No. 123 at 18.  Concerning the Abuse Exclusion's scope, Philadelphia points to *Scottsdale Indemnity Co. v. Beckerman*, in which the Appellate Division held that the "arising out of" language, like that here, "is interpreted broadly."  992 N.Y.S.2d 117, 121 (N.Y. App. Div. 2014).  In *Beckerman*, the Appellate Division explicated the "but-for" test that the Court must apply to determine the provision's applicability:  "[I]f the plaintiff in an underlying action . . . alleges the existence of facts clearly falling within such an exclusion, and none of the causes of action that he or she asserts could exist but for the existence of the excluded activity or state of affairs, the insurer is under no obligation to defend the action."  *Id.* (citing *Mount Vernon Fire Ins. Co. v. Creative Hous.*, 668 N.E.2d 404, 405–07 (N.Y. 1996)).  Thus, Philadelphia contends, Plaintiff "Roldan could not have filed her action and/or any of her causes of action 'but for' the alleged sexual abuse and/or molestation she incurred," and the Abuse Exclusion applies.  ECF No. 123 at 18.

In response, the City concedes that at least some of Ms. Roldan's claims fall within the Abuse Exclusion.  *See* ECF No. 136 at 41.  Nevertheless, it insists that Philadelphia has a duty to

defend because Ms. Roldan "alleges injuries from conduct other than abuse" as well as "abuse outside of the time she was in the custody, care or control of" an insured.  *Id.* at 38.  The City points to various allegations of injuries it claims do not arise out of the alleged sexual abuse.  *See id.* at 42.  To take just two examples, Ms. Roldan alleges that "[w]hen Defendants HeartShare and City moved [P]laintiff out of the Shore home, they left all of [P]laintiff's possessions and all of [P]laintiff's documents, including [P]laintiff's birth certificate, in the Shore home."  SAC ¶ 130.  And Ms. Roldan contends that HeartShare and the City failed to provide her with personal identification as they were legally required to do, and that HeartShare's failure to assist her with obtaining identification following the loss of her birth certificate "caused [her] extreme distress and anguish."  *Id.* ¶¶ 142, 147.  Significantly, "New York courts have repeatedly held that emotional distress of th[is] nature . . . constitutes 'bodily injury' for insurance law purposes."  *Jewish Cmty. Ctr. of Staten Island v. Trumbull Ins. Co.*, 957 F. Supp. 2d 215, 236 (E.D.N.Y. 2013) (cited by Philadelphia, ECF No. 131 at 23).

Philadelphia does not directly engage with this argument and instead retreats to familiar territory, asserting, for example, that the Abuse Exclusion applies because Ms. Roldan "could not have filed her . . . CVA . . . action, which is limited to damages for sexual abuse, *but for* the alleged sexual [abuse] and/or molestation she incurred -- precisely what the exclusion is intended to exclude."  ECF No. 142 at 5.  Philadelphia thus tries to invoke the Abuse Exclusion by shifting upward the level of generality at which the Court performs the but-for inquiry by claiming that "[t]he only legal authority Roldan had to file [her] Complaint was the CVA."  *Id.* at 10 n.1; *see also* ECF No. 191 at 9 (arguing that any claims brought under the CVA and Adult Survivors Act must be predicated on "extreme sexual abuse").  Despite this parsing,

Philadelphia's claim is all-encompassing:  "[C]overage for the SAC is entirely precluded by the Abuse [Exclusion]."  ECF No. 191 at 8.

Intentional or not, Philadelphia's reading of the SAC is far too simplistic.  Consistent with the long time period covered by the SAC and the seriousness of the allegations contained therein, Ms. Roldan's factual assertions and theories of liability are broad and diverse.  Methodologically, Philadelphia identifies not one case in which a court has applied the but-for test in the way it suggests—*i.e.*, as "statutorily limited" to certain damages permitted under a claims-enabling statute like the CVA.  *See* ECF No. 142 at 9–10.  Nor could it, because it is well settled that to determine if a policy exclusion applies, the Court "examin[es] whether the asserted claim could succeed but for the excluded *conduct*."  *See Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 880 F.3d 64, 71 (2d Cir. 2018) (emphasis added); *see also, e.g.*, *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 623 n.15 (2d Cir. 2001) (affirming non-applicability of breach-of-contract exclusion because certain "claims . . . exist independent of the contract" alleged to have been breached).  Put differently, the Court looks at the "operative act giving rise to any recovery."  *Mount Vernon*, 668 N.E.2d at 406.  Thus, for example, where a plaintiff alleged in an underlying action that he was sexually assaulted at a camp, and that the camp was liable for "negligent misrepresentation" due to its failure to provide adequate supervision, a sexual abuse exclusion was effective because "[w]ithout the underlying '[a]buse or [m]olestation' there would [have] be[en] no claim for negligent misrepresentation."  *See TIG Ins. v. Martin*, No. 00-cv-5766, 2003 WL 25796732, at *1, *4 (E.D.N.Y. Feb. 28, 2003).

In this case, by contrast, and consistent with the Court's "obligation to interpret the underlying claims liberally and exclusions narrowly," the Court "cannot find that all of the causes of action would not exist *but for* the existence of [the abuse] allegations."  *See Houlihan*,

449 F. Supp. 3d at 369–71.  Even if Ms. Roldan's claims related to, as the City puts it, "mis-administration or administrative negligence," ECF No. 136 at 43, which do not arise out of the alleged abuse, are somewhat peripheral in view of the entire SAC, they nevertheless "cannot be cast solely and entirely within the policy exclusion[]."  *See Piermont*, 151 F. Supp. 3d at 451 (insurer had duty to defend where sexual abuse exclusion did not apply).  For example, the Court finds that no abuse allegation was needed for Ms. Roldan to seek relief with respect to her lost property or inability to obtain proper identification.[12]  Philadelphia has not carried its heavy burden of demonstrating "with certainty that all possible damages for which [the City] might ultimately be held liable would" be attributed to the excluded conduct.  *See United*, 137 F. Supp. 3d at 176.

Notably, like the insurer in *Piermont*, Philadelphia does not even try to explain how these additional injuries identified by the City arise out of the excluded "operative act" of abuse.  *See* ECF No. 142 at 6.  Instead it asserts:  "All of Roldan's allegations of negligent property damage, loss of funds, the inability to finish her education and/or negligent administration of Roldan's foster care are a legal nullity, time barred, outside the scope of the CVA and [are] precluded from coverage under the Policy."  ECF No. 123 at 19 n.1.  That shotgun argument tucked into a footnote is unpersuasive.  As already explained, neither the CVA nor any other statute enabling a plaintiff to bring certain claims sheds light on the but-for inquiry, and Philadelphia's attempt to prematurely litigate Ms. Roldan's merits arguments fares no better.  *See, e.g.*, *Ruder & Finn*, 422 N.E.2d at 670 ("[A] policy protects against poorly or incompletely pleaded cases as well as those inartfully drafted.").  To the extent Philadelphia claims that these injuries are not covered by

---

[12]      As previously explained, because this but-for analysis is conduct-based, the Court, at this juncture, takes no view on whether this claim or any other will withstand a motion to dismiss.

2011-2012 Primary Policy whatsoever, such argument is unsupported and seeks to erect legally insignificant fences around the scope of the coverage it sold.  After all, Philadelphia itself rightly observed in opposition to Lexington's supplemental brief that even "[i]f the allegations of the complaint are ambiguous or incomplete, the insurer is nevertheless obligated to defend if the case is potentially within the coverage of the policy."  *See* ECF No. 195 at 6 (quoting *Ogden Corp. v. Travelers Indem. Co.*, 681 F. Supp. 169, 172–73 (S.D.N.Y. 1988)).  Indeed, the very reason why insurers face an uphill battle in duty to defend litigation is because that duty is "meant to provide 'litigation insurance'" in cases like this one.  *See Zurich Am. Ins. Co. v. XL Ins. Am., Inc.*, 547 F. Supp. 3d 381, 404 n.7 (S.D.N.Y. 2021), *as corrected*, 556 F. Supp. 3d 301 (S.D.N.Y. 2021).  The Abuse Exclusion does not apply, and Philadelphia has a duty to defend the City.[13]

> v.     <u>Conclusion</u>

For the reasons explained in this subsection, the City's motion for summary judgment with respect to Philadelphia's duty to defend is granted in part.  Philadelphia's motion for summary judgment with respect to its duty to defend the City is denied.

---

[13]  The City does not contest Philadelphia's argument that Ms. Roldan was in the care, custody, and control of an insured, which is one requirement under the Abuse Exclusion.  *See* ECF No. 136 at 44.  However, the City goes on to argue that the Abuse Exclusion ultimately does not apply because some of Ms. Roldan's claims "extend into time periods after [she] had been discharged from foster care."  *See id.* at 45.  That alternative argument is potentially persuasive, but the Court need not reach it here because it has already concluded that the Abuse Exclusion cannot apply here, and that Philadelphia has a duty to defend.  *See, e.g.*, *Agway, Inc. v. Agway Petrol. Corp.*, No. 93-cv-557, 1993 WL 771008, at *11 (N.D.N.Y. Dec. 6, 1993) (after finding that one occurrence did not preclude coverage on notice grounds, finding it "unnecessary" to examine potential notice issue related to a separate occurrence "[b]ecause the court need only find that there exists one claim which could potentially fall within the . . . coverage in order to impose a duty to defend as a matter of law"); *Zurich*, 547 F. Supp. 3d at 404 n.6 (where the court concluded that one complaint triggered a duty to defend, declining to consider a second possible trigger).

### B.  Lexington Has a Duty to Defend the City

As it relates to Lexington, the City claims coverage under various GL policies or policy parts which Lexington issued to Concord between 2003 and 2009.  ECF No. 136 at 10; ECF No. 143-1 ¶¶ 15–20 (Lexington's Rule 56.1 Counterstatement).[14]  Lexington argues that it has no duty to defend the City under any policy, going through Ms. Roldan's pleadings with a fine-tooth comb to identify time periods which potentially implicate the Concord GL coverage.  As relevant here, Lexington isolates "abuse incidents between July 2003 and November 2003, in the home of Debra Shields, a period for which a Concord GL policy was in effect but did not provide additional insured coverage to the City for liability arising out of Concord's operations."  ECF No. 126-15 at 17.  Then, Lexington points to "the period from November 2003 to December 2008, during which [Plaintiff] Roldan alleges that Concord moved her to various foster homes, but does not allege any incidents of abuse or bodily injury."  *Id.*  Finally, Lexington identifies "abuse incidents after December 2008, when Roldan was no longer under Concord's care."  *Id.*

### i.    2003 Policy

Lexington does not contest that Ms. Roldan's allegations concerning abuse in the Shields home (where Concord placed Plaintiff sometime in 2002 and which she left in November 2003, SAC ¶¶ 83–96) implicate the 2003 Policy.  Those allegations certainly involve physical abuse, *see, e.g.*, *id.* ¶ 94, within the policy's scope.  However, Lexington argues that it has no duty to defend pursuant to the 2003 Policy because (1) the City was not an additional insured; (2) there

---

[14]     Philadelphia briefly raises the argument that Lexington is not entitled to summary judgment because it "failed to submit certified copies of all its policies issued to Concord."  *See* ECF No. 131 at 23.  In this context, that argument borders on frivolous.  "[S]o long as evidence will be presented in admissible form at trial, it may be considered on summary judgment."  *See Harleysville Worchester Ins. Co. v. Wesco Ins. Co.*, 750 F. App'x 90, 93–94 (2d Cir. 2019).  The Court will consider the policies provided by Lexington.

was no "occurrence" within the meaning of the 2003 Policy; and (3) the 2003 Policy's abuse exclusion precludes coverage.  ECF No. 126-15 at 19–20.  Lexington's first argument prevails.

The 2003 Policy has distinct language concerning who qualifies as an additional insured. Specifically, it provides additional coverage for "[a]ll those [p]ersons or [o]rganizations as required by written contracts."  ECF No. 126-3 at 29 (2003 Policy) (emphasis omitted).  And here, Concord's written contract with the City indeed required it to obtain coverage "no narrower than that provided by ISO form CG 20-26 (11/85 ed.)."  ECF No. 126-15 at 20 (quoting ECF No. 126-11 at 41 (Aug. 30, 2000, City-Concord Contract)).  That form, in turn, mandated that Concord obtain additional insured coverage "only with respect to liability arising out of [Concord's] operations or premises owned by or rented to [Concord]."  ECF No. 126-14 (ISO Form).  Apparently, though, Concord failed to get such coverage, and instead bought insurance "only for liability rising out of the operations *for* the Named Insured [Concord] *by* the Additional Insured [the City]."  ECF No. 126-3 at 29 (emphasis added).  That presents a serious problem for the City, which hired Concord to perform work for it when it entered into an "Agreement for Purchase of Child Welfare Services."  ECF No. 126-11 at 3.

This basic understanding of the relationship between the City, as purchaser, and Concord, as service provider, is consistent with the SAC's allegations.  *See, e.g.*, SAC ¶ 14h ("Defendant City contracted with defendants Concord and HeartShare to provide foster care to children, and, in doing so, outsourced some of its constitutional obligations to those agencies.").  But the City fights this conclusion when it claims that "ACS [the City's Administration for Children's Services] performed work for Concord" because the City's work was "so intertwined . . . with Concord's foster care responsibilities that it can only be construed as work 'for' Concord by the City."  ECF No. 136 at 30 (emphasis omitted).  In support of that argument, the City refers to

allegations in the SAC highlighting that coordinated relationship with the City and Concord.  *See id.* at 30–32.  For example, Ms. Roldan alleges that Concord "acted jointly with Defendant City, performed a government function, and w[as] entwined with the City in the provision of foster care services to children," that "the City had final decision-making authority" over certain issues, and that Concord would "use the City's tools."  *Id.* at 30–31 (citing SAC ¶¶ 14, 14o, 14x).  Thus, the crux of the City's argument is that because it enabled Concord's work, it did work "for Concord," rendering it an additional insured.  *Id.* at 32–33.

Undoubtedly, the City is dissatisfied with the language of the 2003 Policy because it bargained with Concord for precisely the kind of protection that may have covered it here.  That dissatisfaction, though, cannot lead the Court to accept the City's "[s]trained and unnatural reading[]" of the 2003 Policy's terms, which must be construed to comport with "common speech . . . and the reasonable expectation and purpose of the ordinary businessman."  *See W. Waterproofing Co. v. Zurich Am. Ins. Co.*, 685 F. Supp. 3d 157, 167 (S.D.N.Y. 2023).  The Court agrees with Lexington that "the relevant allegations . . . demonstrate the common-sense reality that the City hires foster care agencies like Concord to do work *for* the City, not the other way around."  ECF No. 126-15 at 23.

The City's position that the work between the City and Concord was "intertwined" does not compel a different conclusion because it relies on a tortured understanding of "for" which is plainly inconsistent with the word's everyday use.  ECF No. 136 at 30.  For instance, an engaged couple is very likely to be closely "intertwined" with their wedding planner by supervising the preparatory work, providing a guest list and seating arrangements, and exercising ultimate decision-making authority over even the smallest details.  Nevertheless, no reasonable person could claim that the couple works *for* the wedding planner they hired.  Precisely the opposite,

28

regardless of how "intertwined" they may be.  It follows that because the language of the 2003 Policy did not make the City an additional insured, Lexington has no duty to defend it under that policy.  *See Colony Ins. Co. v. Sw. Marine & Gen. Ins. Co.*, No. 22-cv-1590, 2024 WL 1195401, at *7 (S.D.N.Y. Mar. 19, 2024) (no duty to defend party who does not qualify as additional insured under relevant policy).  Having concluded that the City is not an additional insured under the 2003 Policy, the Court does not reach Lexington's other arguments as to why there is no duty to defend under that policy.

ii.　　2004 Policy and 2005 Policy

The parties do not dispute that the City is an additional insured under the 2004 Policy and the 2005 Policy, as confirmed by the insurance agreements themselves.  ECF No. 126-4 at 25 (2004 Policy); ECF No. 126-5 at 24 (2005 Policy).  Like the other at-issue policies, these two cover "damages because of bodily injury or property damage" "caused by an occurrence."  ECF No. 126-4 at 4; ECF No. 126-5 at 3.  And according to the policies, an "occurrence" is "an accident, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured."  ECF No. 126-4 at 14; ECF No. 126-5 at 13 (emphases omitted).  Here, the parties hotly dispute whether the underlying action implicates this coverage at all.  Lexington does not seem to contest that certain of Ms. Roldan's allegations come within the scope of these policies but does claim that they are not implicated because "[t]here are no allegations of any abuse or bodily injury in the period between November 2003 and December 2008."  ECF No. 126-15 at 26.  Indeed, all Ms. Roldan explicitly alleges about this time period is that "[i]n total, defendant Concord and its employees placed plaintiff in more than ten different foster homes between May, 1997, and December, 2008."  SAC ¶ 97.  The City responds primarily by pointing to a letter Ms. Roldan's counsel sent to Philadelphia's counsel.  *See* ECF

29

No. 136 at 26.  Because the parties spend so much time discussing that letter, the Court quotes it

at length:

> Plaintiff now confirms that she was sexually, physically, and emotionally abused
> and neglected in foster care during the eight-month period in question (July 1,
> 2008, through February 28, 2009). The abuse took place during that period in the
> foster homes of Kiesha Bell and Gary Hoyte. See, Complaint ¶¶79-98. Plaintiff
> was also sexually, physically, and emotionally abused in 2009 while she was a
> foster child in the home of Dolores Shore (Cmplt. ¶¶99-106), but does not
> remember whether that abuse began before February 28, 2009.
>
> Plaintiff was also sexually, physically, and emotionally abused and neglected
> while in foster care prior to July 1, 2008, and subsequent to February 28, 2009. It
> is plaintiff's understanding that those time periods are not the subject of the
> present inquiry. Plaintiff is suing for the abuse prior to July 1, 2008, from July 1,
> 2008, to February 28, 2009, and subsequent to February 28, 2009.

ECF No. 134-1 at 2.  The City seizes upon this representation to argue that allegations of abuse

"before July 1, 2008, between July 1, 2008, to February 28, 2009, and after February 28,

2009 . . . implicat[e] the entire series of Lexington policies."  ECF No. 136 at 26.  In response,

Lexington argues that the City overstates that significance of the letter, claiming that it "does not

contain any allegations of abuse not contained in Roldan's Complaint" and that the letter "merely

summarizes" the allegations therein.  *See* ECF No. 143 at 14.  In particular, Lexington argues

that the starting point for the abuse in 2008 was after Ms. Roldan was placed into Ms. Bell's

home in December, thereby attempting to shift any liability onto HeartShare, Philadelphia's

insured.  *Id.* at 14–15.

The parties spend an excessive amount of time going back and forth about the importance

of this letter.  Although the Court may consider it in determining whether there is a duty to

defend, *see QBE*, 997 N.Y.S.2d at 440–41, it is ultimately not necessary for the duty to defend

analysis as it relates to the 2004 and 2005 Policies.  To be sure, based on the SAC (as well as the

letter just discussed), there is vagueness around what took place between November 2003 and

30

December 2008.  *See* SAC ¶¶ 96, 103.  But the Court reaches the same conclusion here as it did

with Philadelphia.  The City has the better argument because there is at least some "factual

ambiguity" as to whether covered occurrences took place within the 2004 and 2005 Policies'

coverage periods, *see Hugo Boss*, 252 F.3d at 621–22, and the law requires the Court to resolve

that ambiguity in the insured's favor, *see Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363

F.3d 137, 144–45 (2d Cir. 2004); *see also Olin Corp. v. Ins. Co. of N. Am.*, 218 F. Supp. 3d 212,

217–18 (S.D.N.Y. 2016) (resolving "ambiguous" timing allegations in favor of the insured).

Lexington does not contest that, had Ms. Roldan pinpointed incidents of abuse in the policy

periods, the allegations would be covered by the 2004 and 2005 Policies.  Construing the SAC

"liberally," as it must, *see Century 21*, 442 F.3d at 83, the Court cannot conclude "that there is no

possible factual or legal basis on which [Lexington] might eventually be obligated to indemnify"

the City, triggering Lexington's duty to defend, *see CGS*, 720 F.3d at 82.

  Lexington tries to finely slice up the SAC to extricate itself from any coverage obligation,

but it cannot, at least for the time being,[15] circumvent the pleading's "broad and general"

allegations.  *See Cohen*, 199 N.Y.S.2d at 540 (finding a duty to defend).  As already explained,

the SAC is sweeping and, at least at times, contains indeterminate allegations and theories of

liability.  For instance, Ms. Roldan alleges that she was injured because Concord "improperly

investigated *at least* four different sets of foster parents and improperly licensed or certified

them," and together with the City, "placed [P]laintiff in dangerous situations when they placed

her in the foster homes where she was sexually and physically abused" and "neglected and

emotionally abused." SAC ¶¶ 241, 243–44 (emphasis added).  She further alleges that the City

---

[15] Of course, it may eventually be able to, because "the duty to defend lasts only until the
factual ambiguity is resolved in favor of the insurer."  *Hugo Boss*, 252 F.3d at 622.

"knew or should have known defendant[] HeartShare . . . had policies and practices of failing to investigate prospective foster parents adequately, failing to supervise foster children adequately, and failing to protect foster children from harm, including sex crimes." *Id.* ¶¶ 255–56. Ms. Roldan ultimately seeks to hold the City and Concord liable for the resulting "extraordinary physical and mental injuries, pain and suffering, anguish, terror, confusion, and helplessness," which she contends are "irreversible and permanent." *Id.* ¶ 260.[16]  As was already discussed at length above, an insurer's observation that there is uncertainty with respect to whether otherwise covered allegations fall outside of the policy period will not, as here, be sufficient to defeat the duty to defend. *See supra* at 16, 30–31. On this point, the City is right to observe that "Lexington errs in its attempted dissection of the *Roldan* Complaint in a search for discrete incidents confined to specific policy periods," *see* ECF No. 136 at 26–27, when Ms. Roldan's allegations are of a much more general nature so as to create a reasonable possibility of a coverage, *see QBE*, 997 N.Y.S.2d at 440–41.

In relation to the 2004 and 2005 Policies, Lexington mistakenly puts all its eggs in one basket by pressing only the timing issue. Indeed, Lexington barely engages with either of these

---

[16]  Again, even setting aside the physical injuries, the allegations of emotional distress of this sort also constitute "bodily harm" within the meaning of the policy. *See Jewish Cmty. Ctr.*, 957 F. Supp. 2d at 236. There are, however, certain limits on the City's theory to support coverage under the 2004 and 2005 Policies. It cites Plaintiff Roldan's allegation that "defendant Concord and its employees placed plaintiff in more than ten different foster homes between May, 1997, and December, 2008" and that "[b]ecause of the frequency of the moves and the abuse that she suffered, plaintiff was unable to continue her education . . . . [and] dropped out of school." SAC ¶¶ 97, 140. The City therefore concludes that Plaintiff Roldan "plausibly alleg[es] property damage covered by the Lexington policies." ECF No. 144 at 19. That argument is creative, but unfortunately for the City, such a theory of property damage cannot bring this allegation within the policies' scope, which limits "property damage" to "tangible property," *see* ECF No. 126-4 at 15; ECF No. 126-5 at 14, an argument not actually raised by Lexington but that is nevertheless clear on the face of the policies. Of importance, the definitions of "bodily injury" are not so narrow, reaching "bodily injury, sickness or disease sustained by a person." *See* ECF No. 126-4 at 11; ECF No. 126-5 at 10.

policies in its opposition.  *See generally* ECF No. 143.  However, earlier, with respect to the

2003 Policy, Lexington separately raised an alternate argument for non-coverage, claiming that

an allegation of "knowing misconduct and deliberate indifference on the part of the City" did not

come within that 2003 Policy's definition of "occurrence."  ECF No. 126-15 at 23.  That policy,

like the 2004 and 2005 Policies, defined an "occurrence" as "an accident, which results in bodily

injury or property damage neither expected or intended from the standpoint of the insured."  ECF

No. 126-3 at 15.  Without explanation, Lexington cabined that argument just to the 2003 Policy,

*see* ECF No. 126-15 at 23; ECF No. 143 at 11, and makes no argument for why at least some of

the other conduct alleged in the SAC does not come within that definition of "occurrence."[17]

In the context of the 2003 Policy only, Lexington contends that Ms. Roldan alleges that

the City "acted with deliberate indifference toward [her] safety and welfare," and that allegations

of deliberate indifference cannot constitute an "accident" within the meaning of the policy.  ECF

No. 126-15 at 24–25.  Even if that were the case with respect to the policy period for the 2003

Policy, it does not persuade the Court when it comes to the policy periods for the 2004 and 2005

Policies.  Certainly, at least certain damages—*i.e.*, allegations of mental anguish resulting from

failure to properly investigate at least four different foster homes, SAC ¶¶ 243–44, 260—were

"unexpected, unusual and unforeseen," and are "accidental" within the meaning of the 2004 and

2005 Policies.  *See Com. Union Assur. Co. v. Oak Park Marina, Inc.*, 198 F.3d 55, 59 (2d Cir.

1999).  Those types of damages, which concern alleged mismanagement of Plaintiff's care, arise

out of alleged negligence and do not "flow directly and immediately from an insured's

intentional act" so as to land conclusively outside of the policy coverage.  *See id.*; *see also*

---

[17]     In the same vein, Lexington cites no potentially relevant exclusion which would preclude
coverage under these policies.

*Greenberg v. Nat'l Chiropractic Mut. Ins. Co.*, No. 96-cv-0052, 1996 WL 374145, at *2 (S.D.N.Y. July 3, 1996) ("If the Court cannot determine the theory of liability on which the complainant is proceeding, the insurer is required to defend the insured.").  That is in marked contrast to, for instance, a case relied on by Lexington, ECF No. 126-15 at 24, in which the court concluded there was no duty to defend where the underlying Plaintiff "alleged *only* intentional acts."  *See Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*, No. 18-cv-5892, 2019 WL 8501338, at *5 (E.D.N.Y. July 2, 2019).  Indeed, that court suggested that the outcome would have been different had it found allegations sounding in negligence, specifically rejecting the assertion that it needed to accept the underlying plaintiff's legal characterization of her claims.  *Id.* at *4 & n.10.  In the face of the SAC's broad and general nature, the Court concludes that Lexington has a duty to defend under the 2004 and 2005 Policies.

      iii.      <u>2006 Policy</u>

      The City does not contest that it is not an additional insured under the 2006 Policy.  *See* ECF No. 136 at 25 n.7.  Because the 2006 Policy does not cover the City, Lexington cannot be obligated to defend the City pursuant to it.  *See Colony*, 2024 WL 1195401, at *7.

      iv.      <u>2007 Policy and 2008 Primary Policy</u>

      The 2007 Policy and 2008 Primary Policy contain coverage parts for additional insureds[18] "for 'bodily injury', 'property damage' or 'personal and advertising injury' caused, in

---

[18]      Lexington passively asserts that "the Concord policies which extend additional insured coverage do so only to those entities required to be named as additional insureds by written contract, and the Concord Contract at issue here required the City to be named as an additional insured only under Concord's GL policies, not its PL policies."  ECF No. 126-15 at 28.  The reference to whatever was required in the contract between the City and Concord is a red herring because the 2007 Policy, 2008 Primary Policy, and 2009 Policy all list the City as an additional insured on the GL portion of those policies, *see* ECF No. 126-7 at 5 (2007 Policy); ECF No. 126-

whole or in part, by [Concord's] acts or omissions or the acts or omissions of those acting on

[Concord's] behalf . . . in performance of [Concord's] ongoing operations; or . . . in connection

with [Concord's] premises owned by or rented to [Concord]."  ECF No. 126-7 at 52; ECF No.

126-8 at 51.  As such, there is no material difference in their scopes of coverage from the 2004

and 2005 Policies', and from the initial coverage perspective, the same rationale detailed above

as to why the SAC implicates the 2004 and 2005 Policies applies with equal force to the 2007

Policy and 2008 Primary Policy.

Lexington makes no argument to the contrary and instead points to the two policies'

Abuse and Molestation Endorsement ("Abuse Endorsement"), which covers, *inter alia*, "bodily

injury" and "mental injury" "arising out of . . . [a]ny abuse or molestation incident" under certain

conditions.  *See* ECF No. 126-7 at 56–57; ECF No. 126-8 at 58–59  (emphases omitted).

Coverage under the Abuse Endorsement applies on a claims-made basis (as opposed to an

occurrence basis), meaning that "[t]he claim [under the Abuse Endorsement] must be made and

reported to [Lexington] or [its] authorized representative during the policy period or any

applicable extended reporting period."  ECF No. 126-7 at 57; ECF No. 126-8 at 59 (emphases

omitted).  Thus, according to Lexington, the City cannot obtain coverage under these policies

because it never brought a timely claim.  *See* ECF No. 126-15 at 26.  As should now be clear,

---

8 at 5 (2008 Primary Policy); ECF No. 126-9 at 5 (2009 Policy), and the City claims that it is an
additional insured under those GL parts, *see* ECF No. 136 at 17–18.

Lexington also claims that these additional insured provisions "only amend the GL
coverage parts in those policies" and that "the City could not demonstrate that it would be an
insured under the PL coverage parts of the 2006-2009 Concord primary policies."  *See* ECF No.
126-15 at 29.  Another red herring.  As just stated, the City does not claim coverage under the PL
parts.  And based on review of the insuring agreements, Lexington is entitled to summary
judgment on the narrow issue of the City's lack of coverage under the PL parts of the 2006
Policy, 2007 Policy, 2008 Primary Policy, and 2009 Policy.

that argument fails because it relies on an impermissibly narrow and fragmented reading of the SAC, and a liberal reading of the SAC and the theories of damages alleged therein entitle the City to a defense under the GL parts of those policies without needing to rely on the Abuse Endorsement.

For the same reason, Lexington's contention that the City may not be covered due to a lack of proximate cause "between the additional insured's liability and the named insured's" fails.  *See* ECF No. 143 at 18–19.  Specifically, Lexington notes that the policies contain language extending coverage to the City for certain injuries "caused, ***in whole or in part***, by [Concord's] acts or omissions."  *See* ECF No. 126-8 at 51 (emphasis added).  It goes on to claim that the only allegation in the 2008 policy period relates to Ms. Roldan's time that she spent in the Hoyte home.  *See* ECF No. 143 at 19.  As cross-claimant, Philadelphia states that Ms. Roldan's allegation that Mr. Hoyte had previously "been investigated and licensed as a foster parent, first by defendant Concord and then by defendant HeartShare," SAC ¶ 110, triggers Lexington's duty to defend because of the link to Concord, ECF No. 131 at 9.  Lexington argues that that connection is so "distant" so as to fail the "in part" portion of the additional insured term stated above.  *See* ECF No. 143 at 18.  This discussion, which the Court explores in greater detail below, is ultimately a sideshow to the core of the duty to defend analysis, as both sides focus on the allegations involving Mr. Hoyte at the expense of Ms. Roldan's much broader claims spanning her entire time in foster care.

Lexington raises no potentially relevant exclusions under the 2007 Policy or the 2008 Primary Policy.  Instead, it is Philadelphia that (for reasons that will become clear shortly) asserts the applicability of an exclusion under Lexington's 2008 Primary Policy.  *See* ECF No. 131 at 13–15.  Both the 2007 Policy and the 2008 Primary Policy contained abuse or molestation

exclusions.  *See* ECF No. 126-7 at 54; ECF No. 126-8 at 56.  Philadelphia also adopts

Lexington's argument that there is no coverage under the claims-made Abuse Endorsements due

to the absence of claims made by the City to Lexington.  ECF No. 131 at 15.  Philadelphia makes

no effort to explain how the claims-made Abuse Endorsements displaced the abuse exclusions in

the two Lexington policies.[19]  Indeed, it is telling that, in Lexington's Opposition, it mentions

Philadelphia's invocations of its own exclusions but does not adopt Philadelphia's position,

joining Philadelphia only in the bottom-line contention "that the [2008 Primary Policy] does not

afford coverage."  *See* ECF No. 143 at 18.  Lexington merely reasserts its original position that

the claims-made Abuse Endorsements do not entitle the City to a defense.  *Id.* at 17.  For the

reasons already explained, that argument fails.

v.    <u>2008 Umbrella Policy</u>

Lexington issued Concord an additional policy in 2008, which provided that Lexington

"shall have the right and duty to defend any claim or suit seeking damages covered by the terms

and conditions of this policy when," *inter alia*, "[d]amages are sought for Bodily Injury, Property

Damage, Personal Injury or Advertising Injury covered by this policy but not covered by any

underlying insurance listed in the Schedule of Underlying Insurance or any other underlying

insurance providing coverage to the Insured."  ECF No. 126-10 at 20 (2008 Umbrella Policy)

(emphasis omitted).  After attempting (and failing) to show that no duty to defend the City was

triggered by Lexington's 2008 Primary Policy, Philadelphia claims that the 2008 Umbrella

Policy, which contains no abuse or molestation exclusion, "drops down" to provide excess

---

[19]    Philadelphia's position is also completely internally inconsistent.  In its Opposition, it claims—in perfect opposition to its assertions in that same pleading—that "[t]he main *Roldan* action . . . triggers . . . [the] Lexington 2008-2009 Primary Policy" and that "the *Roldan* Action triggers the Lexington 2008[] primary and umbrella policies, as a matter of law."  ECF No. 131 at 5, 9.

coverage and triggers a defense obligation for Lexington.  *See* ECF No. 131 at 17.  As best the Court can tell, Philadelphia's theory is that because the allegations concerning Mr. Hoyte apparently implicate the policy period for the 2008 Umbrella Policy but are not captured by an exclusion, and because the City failed to make timely claims pursuant to the Abuse Endorsement under the 2008 Primary Policy, Lexington has a duty to defend under the separate umbrella policy.  *See id.* at 15, 17.  In response, Lexington contends that, even if the 2008 Primary Policy is inapplicable, there is still no coverage because there was no occurrence as defined by the 2008 Umbrella Policy, advancing the same proximate cause argument it made to try to defeat coverage under the primary policy.  *See* ECF No. 143 at 18.

Both sides err by losing sight of the insuring agreement, which along with the SAC, is the starting point of the Court's analysis.  As an umbrella policy, this one also has distinct features. For a duty to defend to kick in pursuant to the 2008 Umbrella Policy, there must be certain "damages . . . sought . . . [which are] not covered by any underlying insurance."  ECF No. 126-10 at 20.  The use of the term "not covered" in an umbrella policy like this one "delineates uninsured risks" from insured ones.  *See Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50, 57–58 (2d Cir. 2021).  What SAC allegations represent "uninsured risks" under the 2008 Primary Policy?  According to Philadelphia, the ones within the 2008 Primary Policy's abuse and molestation exclusion, *see* ECF No. 131 at 17–18, as well as those potentially falling under the Abuse Endorsement but for which the City failed to make a timely claim, *see id.* at 15.

Neither argument is convincing.  An excess policy does not automatically take effect just because there is no coverage under the primary policy.  First, as previously mentioned, not even Lexington takes the position that the risks identified by Philadelphia are precluded by an exclusion in the primary policy; rather, it argues that it has no duty to defend because the City

failed to make a timely claim pursuant to the Abuse Endorsement. *See supra* at 37. Review of the Abuse Endorsement confirms that it covers just the types of sex abuse claims identified by Philadelphia. *See* ECF No. 126-8 at 58–60. Second, Philadelphia's understanding of "coverage" under the Abuse Endorsement is wrong. There is no lack of coverage, in the sense that the claims were uninsured, just because the City may have failed to follow the Abuse Endorsement's claims-made procedure. *See Bausch & Lomb Inc. v. Lexington Ins. Co.*, 414 F. App'x 366, 370 (2d Cir. 2011) (even where claims are covered, insured must follow insuring agreement's procedure to trigger duty to defend). When an umbrella policy contains "a condition precedent to triggering the duty to defend," it must be met "before the excess policy will provide a defense." *See Preferred Constr., Inc. v. Ill. Nat'l Ins. Co.*, 494 F. App'x 162, 164–65 (2d Cir. 2012). Because Ms. Roldan does not seek damages not covered by the 2008 Primary Policy but otherwise covered by the 2008 Umbrella Policy, there can be "no present obligation to provide a defense" under the latter. *See id.* (no duty to defend under umbrella policy where coverage was available only after exhaustion of primary policy, which had not yet been exhausted). At least for now, Lexington has a duty to defend pursuant to multiple policies, but this is not one of them.

vi.    2009 Policy

The same is true when it comes to the 2009 Policy. That policy, which was in effect from July 1, 2009, to July 1, 2010, provides additional insured coverage to the City to the same extent as the 2007 Policy and 2008 Primary Policy. *See* ECF No. 126-9 at 5, 55. On this point, Lexington points to Ms. Roldan's allegations that the City ended its relationship with Concord in "late 2008" and Philadelphia's insured, HeartShare, placed Plaintiff into Ms. Bell's home in December 2008. SAC ¶¶ 97–98, 103. Ms. Roldan also alleges that she later left the Bell home for the Hoyte home. *Id.* ¶ 108. And she then claims that at some point in 2009, HeartShare

39

moved her to the Shore home.  *Id.* ¶ 123.  Thus, says Lexington, the 2009 Policy cannot trigger a duty to defend because there are no allegations concerning Concord during the 2009 Policy's coverage period.  The City responds by pointing to the letter from Ms. Roldan's counsel, *see* ECF No. 136 at 26, in which she stated that she "is suing for the abuse . . . subsequent to February 28, 2009," ECF No. 134-1 at 2 (Letter from Ms.  Roldan's Counsel).  Compare that to the SAC, where the only allegation that specifically implicates Concord after Ms. Roldan left Concord's care is in late 2008 concerns her time in the Hoyte home, as Ms. Roldan alleges that Mr. Hoyte "had been investigated and licensed as a foster parent, first by defendant Concord and then by defendant HeartShare."  SAC ¶ 110.

To determine whether there is a duty to defend under the 2009 Policy, the Court must resolve two issues.  The first is a familiar timing problem.  To escape the duty to defend on this basis, Lexington would need to show that "liability coverage does not exist because injury occurred outside the policy period."  *See Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 565 F. Supp. 1485, 1499 (S.D.N.Y. 1983).  But in this duty to defend posture, it is not "unequivocally" clear that that is the case.  *See Olin*, 218 F. Supp. 3d at 217–18.  In this instance, too, there is much factual ambiguity around when Ms. Roldan stayed in the Hoyte home.  Because she was there in or sometime after December 2008 and for a "period of approximately six months," SAC ¶¶ 103, 108, 113, and that ambiguity must be resolved in favor of the insured, *Olin*, 218 F. Supp. 3d at 217–18, Lexington cannot defeat the duty to defend based on timing alone.

The more difficult question is whether the allegations concerning Concord and Mr. Hoyte are sufficient to trigger a duty to defend on Lexington's part because Ms. Roldan stayed with him when she was entrusted to HeartShare's care.  *See* SAC ¶¶ 103, 108.  Although she was not in Concord's care at this point, Ms. Roldan's SAC suggests that it may share in the potential

liability for the alleged abuse and neglect in the Hoyte home because, at some earlier point, Concord had "investigated and licensed [Mr. Hoyte] as a foster parent." *Id.* ¶ 110. As previously mentioned in a different context, Lexington opposed Philadelphia's argument that such connection could trigger a duty to defend on Lexington's part, stating that "Concord's alleged investigation and licensing of [Mr.] Hoyte *years earlier*" did not "provide[] a sufficient nexus between the City's liability and Concord's actions to make the City an additional insured under a Concord policy." ECF No. 143 at 18. As a reminder, under the 2009 Policy, the City is an additional insured "only with respect to liability for 'bodily injury,' 'property damage' or 'personal and advertising injury' caused, in whole or in part, by [Concord's] acts or omissions or the acts or omissions of those acting on [Concord's] behalf" under certain conditions. ECF No. 126-9 at 55 (emphasis omitted).

Did Concord's earlier licensing of Mr. Hoyte result in a covered injury "caused . . . in part . . . by [Concord's] acts or omissions"? The meaning of this "common language" is "now well settled as a matter of New York law": "[C]aused by requires a showing that the named insured's operations proximately caused the bodily injury for which indemnity was sought." *See Ohio*, 2021 WL 797670, at *3. The City must "raise a reasonable possibility that [Concord] proximately caused [Ms. Roldan's injuries]." *See id.* at *6. But it does not once address this issue, nor does it address how the 2009 Policy requires a materially different duty to defend analysis because of how it maps onto Ms. Roldan's allegations. It has thus failed to carry its burden to establish coverage in the first instance. *See id.* at *3.

vii.   Timeliness of Disclaimers

The City argues that Lexington waived "all" policy exclusions because it failed to comply with New York Insurance Law Section 3420(d)(2). *See* ECF No. 136 at 23–25. That

provision provides that "in cases involving death and bodily injury claims arising out of a New York accident and brought under a New York liability policy," the insurer is "require[d] . . . to provide a timely disclaimer for denials of coverage."  *See Penn-Star Ins. Co. v. Loring Place Realty LLC*, No. 22-cv-1154, 2024 WL 1255423, at *6 (S.D.N.Y. Mar. 25, 2024).  When such a disclaimer is based on a policy exclusion, "failure to provide a timely disclaimer under Section 3420(d) precludes denial of coverage."  *Id.*

Here, the parties again talk past each other, with neither explaining the significance of the fact that the City initially sought coverage only under the 2006 and 2007 Policies, nor that these two policies were the only ones under which Lexington initially disclaimed coverage.  *See* ECF No. 134-3 at 2.  Nevertheless, in view of the preceding analysis, the City's argument is no longer relevant since the Court finds that Lexington has a duty to defend, and for those policies under which it has no duty to defend (the 2008 Umbrella Policy or 2009 Policy), the lack of a duty is not predicated on an exclusion but rather non-coverage.  *Cf. Penn-Star*, 2024 WL 1255423, at *6 ("[A] provision that is a fundamental grant of Policy coverage, not an exclusion, is not subject to the timeliness requirements of Section 3420(d).").  This lack of coverage in the first place also defeats Philadelphia's more sweeping argument that Lexington's supposedly untimely disclaimer altogether precludes it from denying coverage under, as now remains relevant, the 2008 Umbrella Policy.  *See* ECF No. 131 at 22–23.  As previously explained, there is no duty to defend under that Policy because, at least for now, the claim "falls outside the scope of the policy's coverage portion" and failure to disclaim cannot "create coverage where it never existed."  *See Penn-Star*, 2024 WL 1255423, at *6.

viii.      Estoppel

In support of its crossclaim, Philadelphia asserts that "Lexington is estopped from

asserting that the Lexington policies do not provide a defense to the City in the *Roldan* Action

because Lexington's position is inconsistent with the position it took" in cases involving

Ms. Roldan's siblings, in which it defended the City.  *See* ECF No. 131 at 18–22.  In support of

this position, Philadelphia invokes the "doctrine of estoppel against inconsistent positions."  *Id.*

To determine if judicial estoppel applies, the court must consider "(1) whether the party's later

position is clearly inconsistent with its earlier position; (2) whether the party's position has been

adopted in some way by the court in the earlier proceeding; and (3) whether the party asserting

the two positions would derive an unfair advantage against the party seeking estoppel."  *See*

*Kennedy v. Basil*, 531 F. Supp. 3d 828, 838 (S.D.N.Y. 2021).  Notably, Philadelphia points to no

case in which a court has estopped an insurer from denying a defense in one action based on its

decision to provide a defense in a similar action (and Philadelphia, an insurer, would surely be

uneasy with such a general rule).  That aside, Philadelphia has not come close to showing that it

has met the requirements for the application of estoppel here.  That is particularly true in the face

of Ms. Roldan's pleadings, in which she sometimes explicitly distinguishes her situation from

that of her siblings.  *See, e.g.*, SAC ¶ 96 (Ms. Roldan alleges that she was separated from her

brother while in Concord's care).  Lexington does not have to supply the City with a defense in

this case merely because it provided a defense to the City in other cases.

ix.      Conclusion

For the reasons explained in this subsection, the City's motion for summary judgment

with respect to Lexington's duty to defend is granted in part.  Accordingly, Philadelphia's

motion for summary judgment on its crossclaim regarding Lexington's duty to defend is also

granted in part.  Lexington's motion for partial summary judgment as to lack of coverage under the PL parts of the 2006 Policy, 2007 Policy, 2008 Primary Policy, and 2009 Policy, is also granted.

## CONCLUSION

For the reasons explained herein, the City's motion for summary judgment is granted in part.  Philadelphia has a duty to defend under the 2011-2012 Primary Policy and Lexington has a duty to defend under the 2004 Policy, 2005 Policy, 2007 Policy, and 2008 Primary Policy.  The City is entitled to reimbursement for the fees and costs of defending the underlying action.  Accordingly, Philadelphia's motion for summary judgment on its counterclaim against the City is denied but is granted in part as to its crossclaim with respect to Lexington's duty to defend.  Lexington's motion for partial summary judgment that it has no duty to defend the City under the PL parts of the 2006 Policy, 2007 Policy, 2008 Primary Policy, and 2009 Policy is also granted.  No party having requested it do so, the Court has not and need not reach any question of indemnification under any policy discussed herein.

Having considered the *Admiral* factors, the City is hereby awarded a declaration of its right to a defense from Philadelphia and Lexington in the underlying action, including reimbursement.  Philadelphia is also awarded a declaration that Lexington has a duty to defend the City in the same action.  The Clerk of Court is respectfully directed to enter judgment consistent with this Order.

On or before June 14, 2024, the City, Philadelphia, and Lexington shall meet and confer and file a joint letter indicating if there is any reason the Court should not dismiss any remaining claims and close this third-party case.  If any Third-Party Litigant indicates that this case should

not be closed, it shall identify with specificity what issues remain, and each party shall provide

its position with respect to those issues.

/s/ Hector Gonzalez
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
      May 31, 2024