UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SABRINA ROLDAN,

                Plaintiff,

     -against-

ADOLFO LEWIS, CECILIA ELLIS,
NATALIE BARNWELL, HEARTSHARE
HUMAN SERVICES OF NEW YORK,
HEARTSHARE ST. VINCENT'S SERVICES,
MARK CASNER, GLORIA ANTONSANTI,
MARIBEL CRUZ, VALERIE RUSSO, CITY
OF NEW YORK, CONCORD FAMILY
SERVICES, LELAR FLOYD, JACQUELINE
HARRIS, THEODORA DIGGS, CLAIRE
HAYNES, and CHARMAINE FRANK,

                Defendants.

Case No.: 20-cv-03580 (HG) (MMH)

**PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO
THE MOTIONS TO DISMISS PLAINTIFF'S FOURTH AMENDED COMPLAINT**

CAROLYN KUBITSCHEK
LANSNER & KUBITSCHEK
325 Broadway, Suite 203
New York, NY 10007
t: (212) 349-0900
ckubitschek@lanskub.com

CLYDE RASTETTER
KOPKE CHRISTIANA & RASTETTER LLP
199 Cook Street, Suite 308
Brooklyn, NY 11206
t: (917) 451-9525
clyde@kcrllp.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION .......................................................................................................... 1

STANDARD OF REVIEW ............................................................................................ 2

FACTS ........................................................................................................................... 3

    A.   The Rodriguez home. ..................................................................................... 3

    B.   The Shields home .......................................................................................... 6

    C.   Transfer of Plaintiff's care to Defendant HeartShare. ................................. 7

    D.   The Hoyte home ............................................................................................ 8

    E.   The Shore home. ........................................................................................... 9

    F.   Later foster homes ........................................................................................ 11

    G.   Defendants' control over Plaintiff and suppression of her ability to seek help. ............... 11

    H.   Plaintiff's conditioning to remain silent about her abuse. ............................ 13

ARGUMENT .................................................................................................................. 15

POINT I: THE COURT SHOULD PUT AN END TO DEFENDANTS' DELAY TACTICS AND ALLOW THIS CASE TO PROCEED TO DISCOVERY ........................................... 15

POINT II: PLAINTIFF'S FOURTH AMENDED COMPLAINT STATES A CLAIM FOR NEGLIGENT SUPERVISION AND RETENTION AS TO ALL DEFENDANTS .................... 17

    A.   Abuse in the Rodriguez home. ...................................................................... 22

    B.   Abuse in the Shields home. ........................................................................... 23

    C.   Abuse in the Shore home. .............................................................................. 24

    D.   Abuse in the Hoyte home .............................................................................. 29

POINT III: PLAINTIFF STATES CLAIMS FOR NEGLIGENT AND STATUTORY FAILURE TO REPORT CHILD ABUSE AGAINST ALL DEFENDANTS ................................ 29

POINT IV: EQUITABLE TOLLING SHOULD BE APPLIED TO PLAINTIFF'S CONSTITUTIONAL CLAIMS .................................................................................... 31

A.  Plaintiff has diligently pursued her rights. ........................................................ 32

B.  Plaintiff's FAC also sufficiently demonstrates that extraordinary circumstances stood in the way of her earlier pursuing her claims. ........................................................ 33

    1.  The profound psychological impact of severe abuse and institutionalized silencing prevented Plaintiff from pursuing timely legal action. ................................................. 34

    2.  Defendants' wrongful actions and omissions systematically interfered with Plaintiff's ability to pursue her claims. ........................................................................................ 35

C.  The factual questions surrounding equitable tolling require an evidentiary hearing, not dismissal at the pleading stage. ......................................................................... 37

CONCLUSION ..................................................................................................................... 39

CERTIFICATE OF COMPLIANCE ....................................................................................... 40

**TABLE OF AUTHORITIES**

**CASES**

*Aegis Ins. Servs. v. 7 World Trade Co., L.P.*, 737 F.3d 166 (2d Cir. 2013) .................................... 2

*Agudelo v. Recovo Mortgage Management, LLC*, No. 22-cv-4004 (JMA)(LGD), 2025 WL 1674486 (E.D.N.Y. June 13, 2025) ............................................................................................ 22

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ................................................. 20, 21

*Audi Vision Inc. v. RCA Mfg. Co.*, 136 F.2d 621 (2d Cir. 1943) ................................................. 16

*Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214 (E.D.N.Y. 2015) .................................... 16

*Baldayaque v. United States*, 338 F.3d 145 (2d Cir. 2003) ............................................................ 33

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007) .............................................................. 3, 16, 19

*BL Doe 5 v Fleming*, 199 A.D.3d 1426 (4th Dept 2021) ................................................................ 30

*Boykin v. KeyCorp.*, 521 F.3d 202 (2d Cir. 2008) ......................................................................... 21

*Brown v. Parkchester S. Condominiums*, 287 F.3d 58 (2d Cir. 2002)........................................... 38

*Canales v. Sullivan*, 936 F.2d 755 (2d Cir. 1991) ........................................................................ 38

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ........................................................ 2

*Chisholm-Mitchell v. Ahmed*, No. 20-CV-3434 (PKC) (LB), 2021 WL 512460 (E.D.N.Y. 2021) 16

*Clark v. Hanley*, 89 F.4th 78 (2d Cir. 2023) ............................................................ 31, 37, 38, 39

*Doe v. United States*, 76 F.4th 64 (2d Cir. 2023) ................................................................. passim

*Elliott v. City of New York*, 95 N.Y.2d 730 (2001) ................................................................. 17, 25

*Ericson v. Pardus*, 551 U.S. 89 (2007) ........................................................................... 16, 19, 21

*Friedman v. N.Y.C. Admin. for Child.'s Servs.*, No. 04–CV–3077 (ERK), 2005 WL 2436219 (E.D.N.Y. 2005) ....................................................................................................................... 16

*Grabowski v. Orange County*, 219 A.D.3d 1314 (2d Dept 2023)................................................. 20

*Harper v. Ercole*, 648 F.3d 132 (2d Cir. 2011) ........................................................................... 31

*Holland v. Florida*, 560 U.S. 631 (2010) ..................................................................................... 32

*Johnson v. City of Shelby, Mississippi*, 574 U.S. 10 (2014)........................................................ 30

*Kennedy v. Berkel & Co. Contractors, Inc.*, 319 F. Supp. 3d 236 (D.D.C. 2018) ........................ 34

*Kwitko v. Camp Shane, Inc.*, 224 A.D.3d 895 (2d Dept 2024) ............................................... 20, 21

*Lama v. Malik*, 58 F. Supp. 3d 226 (E.D.N.Y. 2014) .................................................................... 38

*Lee v. Albarran*, No. 23-cv-11215 (NSR), 2024 WL 4987310 (S.D.N.Y. Dec. 5, 2024)............. 28

*Lopez v. City of New York*, 172 A.D.3d 703 (2d Dept. 2019) ...................................................... 22

*Lynch v. City of New York*, 952 F.3d 67 (2d Cir. 2020)................................................................... 3

*MCVAWCD-DOE v. Columbus Ave. Elementary Sch.*, 225 A.D.3d 845 (2d Dept 2024)....... 20, 24

*Mirand v. City of New York*, 84 N.Y.2d 44 (1994) ....................................................................... 22

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005) ............................................................................ 31, 33

*Pratt v. Robinson*, 39 N.Y.2d 554 (1976)..................................................................................... 30

*Read v. Corning Inc.*, 371 F. Supp. 3d 87 (W.D.N.Y. 2019) ........................................................ 21

*Reyes v. Fairfield Properties*, 661 F. Supp. 2d 249 (E.D.N.Y. 2009) .......................................... 32

*Riviello v. Waldron*, 47 N.Y.2d 297 (1979) ................................................................................. 28

*S.H. v. Diocese of Brooklyn*, 205 A.D.3d 180 (2d Dept 2022)...................................................... 33

*Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995) ...................................................... 31

*Smalls v. Collins*, 10 F.4th 117 (2d Cir. 2021) ............................................................................ 31

*Stoll v. Runyon*, 165 F.3d 1238 (9th Cir. 1999)............................................................................ 34

*Sweet v. Sheahan*, 235 F.3d 80 (2d Cir. 2000) .............................................................................. 2

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ..................................................................... 21

*T.W. v. City of New York*, 286 A.D.2d 243 (1st Dept 2001) ......................................................... 28

*Thibodeaux v. Travco Ins. Co.*, No. 13–CV–5599, 2014 WL 354656 (E.D.N.Y. Jan. 31, 2014) . 16

*Torres v. Barnhart*, 417 F.3d 276 (2d Cir. 2005).......................................................................... 38

*United States v. Shaw*, 464 F.3d 615 (6th Cir. 2006) .................................................................. 31

iv

*Valdez ex rel. Donely v. United States*, 518 F.3d 173 (2d Cir. 2008) ...................................... 35, 37

*Valverde v. Stinson*, 224 F.3d 129 (2d Cir. 2000) ........................................................ 38

*Van Gaasbeck v. Webatuck Cent. Sch. Dist. No. 1*, 21 N.Y.2d 239 (1967) ............................ 17, 25

*Weisbrod-Moore v. Cayuga County*, No. 7, 2025 WL 515393 (N.Y. Feb. 18, 2025)................... 17

**STATUTES**

28 U.S.C. § 1331 ................................................................................................................. 1

28 U.S.C. § 1332 ................................................................................................................. 1

28 U.S.C. § 1343 ................................................................................................................. 1

42 U.S.C. § 1983 ............................................................................................................... 31

N.Y. Soc. Serv. Law § 371(10)(a) ................................................................................... 18

N.Y. Soc. Serv. Law § 371(10)(b) ................................................................................... 18

N.Y. Soc. Serv. Law § 372(3) .......................................................................................... 19

N.Y. Soc. Serv. Law § 377 .......................................................................................... 18, 19

N.Y. Soc. Serv. Law § 378 .......................................................................................... 18, 19

N.Y. Soc. Serv. Law § 378-a(1) ....................................................................................... 19

N.Y. Soc. Serv. Law § 378-a(2)(a).............................................................................. 25, 28

N.Y. Soc. Serv. Law § 378-a(2)(e)(1) .............................................................................. 18

N.Y. Soc. Serv. Law § 378-a(2)(h)............................................................................. 18, 29

N.Y. Soc. Serv. Law § 413(1)(a) ...................................................................................... 30

N.Y. Soc. Serv. Law § 413(a) ........................................................................................... 30

N.Y. Soc. Serv. Law § 420 ............................................................................................... 30

**RULES**

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 37

Fed. R. Civ. P. 8................................................................................................................ 21

Fed. R. Civ. P. 8(a)(2) ............................................................................................. 16, 19

**REGULATIONS**

N.Y. Comp. Codes R. & Regs. tit. 18, § 441.21 ............................................................. 19

N.Y. Comp. Codes R. & Regs. tit. 18, § 443.1 ............................................................... 18

N.Y. Comp. Codes R. & Regs. tit. 18, § 443.12 ............................................................. 18

N.Y. Comp. Codes R. & Regs. tit. 18, § 443.3(a) ........................................................... 19

N.Y. Comp. Codes R. & Regs. tit. 18, § 443.8(g)(2) ...................................................... 28

**INTRODUCTION**

On August 9, 2020, Plaintiff, Sabrina Roldan ("Plaintiff"), filed the instant action,

seeking damages for sexual abuse that she suffered over a period of ten years while she was a

child in foster care in New York City.[1] She raised claims under both state and federal law against

the City of New York ("the City"), which was her legal custodian while she was in foster care,

the two foster care agencies in whose care the City had placed her (Defendants Concord Family

Services ("Concord") and HeartShare Human Services ("HeartShare")), and various employees

of those organizational defendants including Defendants Mark Casner, Gloria Antonsanti,

Maribel Cruz, and Valerie Russo (collectively with the City, the "City Defendants); Defendants

Adolfo Lewis, Cecilia Ellis, and Natalie Barnwell (collectively with HeartShare, the "HeartShare

Defendants"); and Defendants Lelar Floyd, Jacqueline Moseley, Theodora Diggs, Claire Haynes,

and Charmaine Frank (collectively, the "Concord Defendants").[2] She has amended the complaint

four times, adding additional facts and additional claims.

Defendant City filed third-party claims for indemnification against the insurance carriers

of the foster care agencies, and the Court stayed all proceedings in the instant action while those

claims were litigated. Since the lifting of the stay, limited disclosures were undertaken before

discovery was again stayed pending decision on the instant motions by all Defendants to dismiss

various claims from Plaintiff's Fourth Amended Complaint. *See* ECF No. 267; Order dated June

13, 2025.

---

[1]    This Court has jurisdiction under 28 U.S.C. § 1332, based upon diversity of citizenship, as well as under 28 U.S.C. §§ 1331 and 1343, based upon Plaintiff's constitutional claims.

[2]    Defendant Concord itself has failed to respond to the complaint, and the Clerk of Court has entered default. *See* ECF No. 206.

With some minor variations, all Defendants contend that Plaintiff's causes of action either fail to state causes of action or are time-barred. *See generally* Mem. of Law in Supp. of Defs.' City of New York, Mark Casner, Gloria Antonsanti, Maribel Cruz & Valerie Russo's Mot. to Dismiss Pl.'s Fourth Am. Compl., ECF No. 269-1 ("City Defs.' Mem."); Mem. of Law in Supp. of Defs. Adolfo Lewis, Cecilia Ellis, Natalie Barnwell, HeartShare Human Services of N.Y., & HeartShare St. Vincent's Services' Mot. to Dismiss, ECF No. 270 ("HeartShare Defs.' Mem."); Mem. of Law in Supp. of Mot. to Dismiss Fourth Am. Compl., ECF No. 271-1 ("Concord Defs.' Mem.").

As discussed more fully below, this Court has already determined that at least some of Plaintiff's claims state causes of action, and the time has come to allow this case to proceed to discovery rather than continue with piecemeal motions that needlessly delay justice for a survivor of horrific childhood abuse. This consolidated memorandum of law is submitted in opposition to the motions of all Defendants.

## STANDARD OF REVIEW

Dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Aegis Ins. Servs. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quoting *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000)). On a motion to dismiss, a Court must "constru[e] the complaint liberally, accept[ing] all factual allegations in the complaint as true, and draw[ing] all reasonable inferences in the plaintiff's favor." *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of

actionable misconduct. *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 556 (2007)).

**FACTS**

Plaintiff Sabrina Roldan was born in 1992 and placed into foster care by Defendant City in May 1997, when she was five years old. *See* Fourth Amended Complaint, ECF No. 256 ("FAC") ¶¶ 12, 69–70. The City initially entrusted Plaintiff and her two siblings to Defendant Concord, a not-for-profit corporation the City contracted with to care for children in the City's custody, for whom the City retains ultimate responsibility. *Id.* ¶¶ 18–19, 22–31, 71.

**A. The Rodriguez home.**

In October 1997, Concord placed Plaintiff and her siblings in the foster home of Juan and Maria Rodriguez, with the knowledge and consent of the City. *Id.* ¶ 72. In placing Plaintiff and her siblings in the Rodriguez home, Defendants Concord, Floyd, Diggs, Barnwell, Harris, Frank, and Haynes violated statutory limits on the number of foster children allowed in a home, placing Plaintiff in a home that was already over-capacity and for which the Rodriguezes were not properly certified. *Id.* ¶¶ 73–86. These Defendants had already placed other foster children in the home and so they should have known that the Rodriguezes were not permitted under New York law or their certificate to care for Plaintiff and her siblings. *Id.* ¶¶ 73–86. Despite this, said Defendants proceeded with the placement, and violated statutory duties imposed for the benefit of foster children like Plaintiff. *Id.* ¶¶ 73–86.

When Plaintiff was approximately eight years old, Juan Rodriguez began sexually abusing her. *Id.* ¶ 90. The abuse occurred regularly, sometimes daily. *Id.* Mr. Rodriguez took Plaintiff to her bedroom or the windowless basement to abuse her. *Id.* ¶ 91. He regularly licked Plaintiff's genitalia, thighs, stomach and breasts, and fondled Plaintiff's body. *Id.* ¶¶ 92–93. He

frequently laid on top of Plaintiff on her bed and simulated sexual intercourse. *Id.* ¶ 94. He repeatedly forced Plaintiff to stroke his penis, grabbing her arm and forcing her hand onto his penis when she tried to pull away. *Id.* ¶ 95. Because Juan Rodriguez was much larger and stronger than Plaintiff, she was unable to escape his unceasing assaults. *Id.* ¶ 94.

Maria Rodriguez also physically abused Plaintiff on an almost daily basis. *Id.* ¶ 96. Mrs. Rodriguez often beat Plaintiff until she was bruised and bleeding, using metal rods, baseball bats, tree branches, spoons, wires and hangers, leaving marks on Plaintiff's body that were visible to Defendant Frank. *Id.* ¶ 97. Mrs. Rodriguez repeatedly forced Plaintiff to kneel on raw rice until her knees bled. *Id.* ¶ 98. On at least one occasion, Mrs. Rodriguez tied Plaintiff and her siblings to chairs and left them alone for many hours. *Id.* ¶ 100. She regularly locked Plaintiff in the dark, windowless basement—with inadequate ventilation and no toilet facilities—for hours at a time, often failed to bathe Plaintiff, and sent Plaintiff to school wearing filthy clothes. *Id.* ¶ 101. Mrs. Rodriguez's abuse of Plaintiff was part of an effort to force Plaintiff to submit to and conceal the sexual abuse by her husband. *Id.* ¶ 99.

Defendants Concord, Floyd, Diggs, Barnwell, Harris, Frank, and Haynes had direct, contemporaneous notice of alarming injuries and conditions in the Rodriguez home. *Id.* ¶ 87. These Defendants and other employees of Concord repeatedly observed bruises, lacerations, and other injuries on Plaintiff and her siblings—some requiring stitches—which the Rodriguezes could not provide any credible explanations for. *Id.* ¶¶ 87–88. Additionally, said Defendants learned that the Rodriguezes were leaving Plaintiff and her siblings unattended for extended periods, but nonetheless failed to act or otherwise report the abuse and maltreatment they were aware of to the New York State Central Register of Child Abuse and Maltreatment ("SCR") as required by law. *Id.* ¶¶ 87–89, 126–28.

During visits at Concord's office, Plaintiff's father also repeatedly observed signs that Plaintiff and her siblings were being abused and maltreated. *Id.* ¶¶ 114–15. He complained about the abuse of his children to Concord employees on many occasions, including to Defendants Harris, Frank, and Haynes, who recorded these complaints in Concord's case file that was reviewed by Defendants Floyd, Diggs, and Barnwell during supervisory reviews. *Id.* ¶¶ 115–16 Despite this actual notice of the Rodriguezes' abuse of Plaintiff, none of the Concord defendants took any action to protect Plaintiff from further abuse and they all failed to report Plaintiff's father's concerns to the SCR. *Id.* ¶ 117.

After the Concord defendants failed to protect Plaintiff, Plaintiff's father sought help from staff at Plaintiff's school. *Id.* ¶ 118. Instead of protecting Plaintiff, defendants City and Concord obtained a court order prohibiting Plaintiff's father from going to his children's school. *Id.* ¶ 119. The City, Concord, and HeartShare defendants continued to bar Plaintiff's father from going to Plaintiff's schools for the duration of her stay in foster care. *Id.* ¶¶ 119–21.

In early 1998, Plaintiff's brother disclosed the Rodriguezes' physical abuse to a mental health professional, who advised defendants City, Concord, Casner, Antonsanti, and Cruz of the disclosure. *Id.* ¶¶ 104–05. Concord also advised Defendants Floyd, Diggs, Barnwell, Harris, Haynes, and Frank of this disclosure. Despite being required to report the suspected abuse to the SCR, all of these defendants failed to do so. *Id.* ¶¶ 107–10. Shortly thereafter, defendants City, Concord, Casner, Antonsanti, Cruz, Floyd, Barnwell, Diggs, Harris, Haynes, and Frank were provided with actual notice of Maria Rodriguez's physical abuse of Plaintiff by an eyewitness. *Id.* ¶ 111. Despite this knowledge, none of these defendants made reports to the SCR regarding the abuse of Plaintiff. *Id.* ¶ 112. Similarly, these defendants also failed to forward a subsequent

allegation from staff at Plaintiff's elementary school that she was being abused and neglected to the SCR. *Id.* ¶¶ 122–24.

Because Defendants City, Concord, Casner, Antonsanti, Cruz, Floyd, Barnwell, Diggs, Harris, Haynes, and Frank failed to take any action to protect Plaintiff from the abuse they knew was occurring in the Rodriguez home or report the abuse to the SCR, it continued regularly until 2002, when Plaintiff and her siblings left the Rodriguez home at the Rodriguezes' request. *Id.* ¶¶ 87–89, 104–34.

## B. The Shields home.

Defendants Concord, Floyd, Diggs, Harris, Haynes, and Frank next placed Plaintiff in the foster home of Debra Shields. *Id.* ¶ 136. Debra Shields had a substantiated history of child abuse known to said Defendants, including a confirmed report from 1988 for abusing her own child. *Id.* ¶¶ 139–41. Under New York law, this disqualified Shields from serving as a foster parent absent a written explanation from the certifying agency justifying the licensure of a confirmed abuser. *Id.* ¶ 142. Defendants Concord, Floyd, Diggs, Harris, Haynes, and Frank failed to provide such justification in writing and certified Shields anyway—again running afoul of statutory duties imposed for the benefit of foster children. *Id.* ¶¶ 143–45. Prior to Plaintiff's placement in the Shields home, Shields was again confirmed as a child abuser after a report made in 2002 about her abusing a child or foster child in her home was substantiated by ACS. *Id.* ¶ 146. Nevertheless, Defendants Concord, Floyd, Diggs, Harris, Haynes, and Frank failed to revoke Shields' foster parent certification, in violation of their obligation to use reasonable care in protecting foster children from abuse. *Id.* ¶¶ 147–50.

Despite knowing of Shields' confirmed history of child abuse and the presence of two adolescent boys in her home who posed a danger to Plaintiff—one of whom Concord had placed

there—Defendants Concord, Floyd, Diggs, Harris, Haynes, and Frank placed Plaintiff and her siblings in Shields' home in January 2003. *Id.* ¶¶ 150–51, 161–62. Two months later in March 2003, the SCR received another report about Shields maltreating her own son, which obligated Defendants City, Concord, Casner, Antonsanti, Cruz, Floyd, Diggs, Harris, Haynes, and Frank to determine whether Plaintiff and her siblings were safe in the home. *Id.* ¶¶ 156–58. Despite being informed of this investigation, these same Defendants failed to take any action, and allowed Plaintiff to remain in the home and Shields to abuse and mistreat children with impunity because she did volunteer work for Concord. *Id.* ¶¶ 159–60.

While Plaintiff lived in the Shields home, she was changing the sheets in her room on one occasion when one of the adolescent boys came into the room and sexually assaulted her by pushing her onto the bed, and pinning her under his body. *Id.* ¶ 163. When Plaintiff managed to escape, the boy threw her against a dresser. *Id.* ¶ 164. Instead of protecting Plaintiff, Debra Shields physically assaulted her as punishment for the incident. *Id.* ¶ 166. Plaintiff was not removed from the Shields home until sometime later, when Shields hit Plaintiff's younger sister in the head with a frying pan. *Id.* ¶ 167. After removing Plaintiff from the Shields home, Defendants separated her from her brother and placed her in yet another new foster home—her fourth. *Id.* ¶ 168.

### C. Transfer of Plaintiff's care to Defendant HeartShare.

In total, Concord and its employees placed Plaintiff in more than ten different foster homes between May 1997 and December 2008, all with the knowledge and consent of defendant City. *Id.* ¶ 169. In late 2008, the City terminated its relationship with Concord due to gross mismanagement, fiscal impropriety, and criminal activity. *Id.* ¶¶ 170–71. The City then placed Plaintiff in the care of Defendant HeartShare—another not-for-profit corporation the City

contracted with to care for foster children—despite knowing HeartShare was one of the most dangerous foster care agencies in the City. *Id.* ¶¶ 172–74.

In December 2008, with the knowledge and consent of defendant City, HeartShare placed Plaintiff in the home of Kiesha Bell. *Id.* ¶ 175. Bell did not provide food to Plaintiff, and her home was filthy, malodorous, overcrowded, and dangerous. *Id.* ¶¶ 176–78. Bell also left her door open at night, allowing adult men unknown to Plaintiff to enter and leave throughout the night. *Id.* ¶ 177. Plaintiff told HeartShare employees about Bell's dangerous and neglectful behavior, but HeartShare took no action. *Id.* ¶ 179. Accordingly, Plaintiff fled Bell's home and went to stay with her brother in the foster home of Gary Hoyte. *Id.* ¶ 180.

### D. The Hoyte home.

Defendants City, HeartShare, Barnwell, Lewis, and Ellis became aware that Plaintiff was staying in Gary Hoyte's home and ratified her placement there. *Id.* ¶ 181. Hoyte had been licensed first by Concord and later by HeartShare, and his home was filthy, overrun by vermin and insects, and unfit for habitation. *Id.* ¶¶ 182, 195. Despite knowing this and that Hoyte was a sexual predator—and even that he sexually harassed defendant Ellis during her visits to the home—Defendants HeartShare, Barnwell, Lewis, and Ellis allowed Plaintiff to remain in Hoyte's care. *Id.* ¶¶ 183–84. Hoyte also kept pornographic DVDs and tapes throughout his home, including in bedrooms and the living room. *Id.* ¶¶ 185. Defendant Ellis personally observed this material and informed her supervisors, including Lewis and Barnwell, about Hoyte's sexual harassment and the pornographic materials he openly kept around the foster home. *Id.* ¶¶ 184–87. Nevertheless, no action was taken.

For at least six months, Hoyte subjected Plaintiff to repeated sexual abuse and harassment. *Id.* ¶¶ 188–89. He repeatedly subjected Plaintiff to unwanted sexual touching and

groping, and propositioned Plaintiff or attempted to pull her into his bedroom. *Id.* ¶¶ 190–93. On one occasion, while Plaintiff was in the kitchen, Hoyte came up behind her and rubbed his body against Plaintiff's body. *Id.* ¶ 190. During the six-month period when Hoyte was regularly sexually harassing her, Plaintiff had several personal meetings with Defendant Lewis at HeartShare where she detailed Hoyte's behavior. *Id.* ¶ 196. Even so, neither Defendant Lewis, nor Defendant Ellis, nor any other employee of HeartShare took any action to protect Plaintiff. *Id.* ¶¶ 196–97.

**E. The Shore home.**

Eventually in 2009, Defendants City, HeartShare, Barnwell, Lewis, and Ellis placed Plaintiff in the foster home of Dolores Shore, where Plaintiff's sister was already living as a foster child. *Id.* ¶ 198. Plaintiff lived there for some months in 2009 and later returned in October 2010, remaining in the home from that time until January 2012. *Id.* ¶¶ 198–99.

Shore initially was licensed as a foster parent for Defendant Concord in 1995, and authorized to care for two female foster children between the ages of five and eleven. *Id.* ¶¶ 200–04. Even though Shore was neither capable of nor licensed for caring for boys, Defendants Concord, Floyd, Harris, Barnwell, and Diggs placed two brothers, Kyle (born 1990) and Max (born 1991), in Shore's home with the consent of Defendant City, who Shore later adopted. *Id.* ¶¶ 205–06. Based on notations in Shore's homefinding file, Defendants Concord, Floyd, Harris, Barnwell, and Diggs were aware that Shore was incapable of controlling her sons' sexual misbehavior, yet failed to provide her with any training to address this deficiency. *Id.* ¶¶ 207–09.

As Kyle and Max reached adolescence and adulthood, both developed propensities for sexual violence against younger girls that Shore could not control. *Id.* ¶¶ 210–11. By 2004, when Defendants City, Concord, Floyd, Diggs, Harris, Haynes, and Frank placed Plaintiff's younger

sister in Shore's home, they knew or should have known of the boys' dangerous propensities but failed to properly supervise the home. *Id.* ¶¶ 212–13. Kyle Shore was convicted of armed robbery in 2007 and incarcerated until August 2009, while Max Shore also developed an extensive criminal record. *Id.* ¶¶ 215–16.

When Concord ceased operations in December 2008, Shore's home transferred to HeartShare, which knew or should have known of Kyle and Max Shore's propensities for sexual violence. *Id.* ¶¶ 217–18. When Kyle returned from prison in August 2009 and Max turned 18, defendants City, HeartShare, Barnwell, Lewis, and Ellis were required by New York law to conduct thorough evaluations and criminal background checks before placing foster children in the home. *Id.* ¶¶ 219–21. Said Defendants failed to conduct any such evaluations or background checks, violating a statutory duty imposed for the benefit of foster children and signaling that foster care rules could be ignored with impunity. *Id.* ¶¶ 222–25.

In June 2010, Kyle Shore sexually assaulted and attempted to rape Plaintiff's sister in the Shore home. *Id.* ¶¶ 226–27. Though Defendants City, HeartShare, Barnwell, Lewis, and Ellis learned of this assault and removed Plaintiff's sister, they refused to help her report the crime to police and failed to report it themselves. *Id.* ¶¶ 228–30. Despite this and being fully aware of Shore's inability to control her sons' history of sexual assaults, these same Defendants recklessly placed Plaintiff back in Shore's home in October 2010. *Id.* ¶ 231.

While there, Max Shore repeatedly sexually assaulted Plaintiff, rubbing his body against hers and attempting to remove her clothing. *Id.* ¶¶ 232–33. On one occasion, he threw her down, climbed on top of her, pinned her arms, and attempted to rape her, stopping only when another adult entered after hearing her screams. *Id.* ¶ 234. Shore's son and his girlfriend also regularly subjected Plaintiff to sexual harassment and threats. *Id.* ¶ 235. These assaults continued until

Plaintiff fled in January 2012, advising HeartShare the home was unsafe. *Id.* ¶¶ 237–38. When HeartShare belatedly moved her out, they left all her possessions and documents, including her birth certificate, behind. *Id.* ¶ 239.

### F. Later foster homes.

The City and HeartShare then moved Plaintiff back to Kiesha Bell's home, where Bell's mistreatment and endangerment of Plaintiff began anew. *Id.* ¶ 240. Thereafter, defendants City and HeartShare moved Plaintiff to numerous other foster homes, eventually placing her in the foster home of Helen Lacy. *Id.* ¶¶ 241–42. Lacy's home was extremely overcrowded, with up to ten children in the home. *Id.* ¶ 243. Lacy kept guns in the apartment and had many male guests she referred to as her "brothers," even though they were not related to her. *Id.* ¶ 244. Lacy's former boyfriend, who had lived with her, was facing numerous criminal charges for murder, drugs, and gun possession. *Id.* Plaintiff was terrified of living with Lacy and begged defendants Ellis and Lewis to remove her, but the City and HeartShare took no action. *Id.* ¶¶ 245–46. Eventually, and belatedly, HeartShare moved Plaintiff out of Lacy's home. *Id.* ¶ 247.

In total, HeartShare moved Plaintiff to more than ten different foster homes. *Id.* ¶ 248. Because of the frequency of the moves and abuse she suffered, Plaintiff was unable to continue her education and dropped out of school. *Id.* ¶ 249. When she could not bear the ongoing abuse and neglect any longer, Plaintiff signed herself out of foster care before turning twenty-one and has lived on her own since then. *Id.* ¶ 250.

### G. Defendants' control over Plaintiff and suppression of her ability to seek help.

Throughout Plaintiff's entire time in foster care from May 1997 to February 2012, she was in the legal custody of defendant City and completely dependent on the City for all her needs, including food, clothing, shelter, and protection from abuse. *Id.* ¶ 257. The City, along

with its designated agents, defendants Concord and HeartShare, determined and approved where Plaintiff would live, where she would go to school, and which doctors would treat her. *Id.* ¶¶ 258–60. As a child in foster care, Plaintiff had no right to veto any of defendants' selections and was utterly unable to protect herself from the assaults she suffered in the foster homes where defendants placed her. *Id.* ¶ 261. Thus, after Plaintiff ran away from the home of Kiesha Bell in or about 2009 because the home was dangerous, she was utterly powerless to refuse to return to that home when defendants City and HeartShare later returned her there. *Id.* ¶ 262.

On numerous occasions while in HeartShare's care, Plaintiff attempted to avoid further sexual and physical abuse by running away from abusive foster homes. *Id.* ¶ 263. However, every time Plaintiff ran away, defendants City and HeartShare classified her as absent without leave (AWOL) and on several occasions called the police and directed them to arrest Plaintiff and return her to the foster homes she had tried to escape. *Id.* ¶ 264. The police complied with the defendants' requests and on multiple occasions seized Plaintiff after she had run away from abusive foster homes and returned her to the homes of her abusers. *Id.* ¶ 265.

Defendants City, Concord, and HeartShare also exerted complete control over all interactions between Plaintiff and her parents, including how often they could see her and where visits would take place. *Id.* ¶¶ 267–69. All visits between Plaintiff and her parents were conducted in the presence of a Concord or HeartShare employee, who would listen to everything Plaintiff said. *Id.* ¶ 269. Plaintiff's father tried to protect Plaintiff, in vain, by reporting to defendant Concord his suspicions that the Rodriguezes were abusing Plaintiff. *Id.* ¶ 270. Eventually, the City terminated the parental rights of Plaintiff's mother and ceased all contact between them. *Id.* ¶ 271. Plaintiff's father later relinquished his parental rights, and all contact between Plaintiff and her father ceased, leaving her with no one else to protect her. *Id.* ¶ 272.

**H. Plaintiff's conditioning to remain silent about her abuse.**

Studies show that survivors of child sexual abuse often delay disclosure for years or even decades, and that 60–80% of survivors do not disclose their abuse until adulthood. *Id.* ¶ 273. Victims abused by family members or caregivers, like Plaintiff, often delay disclosure significantly longer than those abused by non-relatives. *Id.* Individuals who have experienced physical and sexual abuse during childhood also often develop a sense of learned helplessness and experience futility with regard to reporting and/or speaking about the abuse, especially if the individual has a history of being told that abuse did not occur, or of being ignored or disbelieved by caregivers or authorities. *Id.* ¶ 274. It is also very common for survivors of childhood sexual abuse to experience considerable shame about the abuse, which can serve as a further deterrent to bringing the abuse into public view, for example, by filing a lawsuit. *Id.* ¶ 275.

Here, Plaintiff was conditioned from a young age to deny, feel shame, and remain silent about the abuse she suffered. *Id.* ¶ 276. After Juan Rodriguez's sexual abuse of Plaintiff became evident to other members of the Rodriguez home, Maria Rodriguez instructed Plaintiff to deny the abuse if anyone asked her about it and to pretend it was all just a dream. *Id.* Maria Rodriguez also threatened to kill Plaintiff if she reported the sexual abuse to anyone and employed severe physical abuse to reinforce the threats and ensure Plaintiff's silence, including by beating Plaintiff with metal rods, baseball bats, tree branches, spoons, wires, and hangers on a near daily basis. *Id.* ¶ 277. This enforced secrecy and denial, backed by violent threats and physical abuse, became deeply internalized in Plaintiff and created a psychological barrier so profound that, for many years, Plaintiff was unable to speak about the abuse she had suffered. *Id.* ¶ 278.

Throughout Plaintiff's time in foster care, all Defendants reinforced her traumatic conditioning and the notion that Plaintiff should not talk about or reveal the abuse she had

suffered. For example, when Plaintiff disclosed Juan Rodriguez's sexual abuse to a doctor employed by Concord after she had been removed from the home, neither the doctor nor Defendants Concord, Floyd, Diggs, Harris, Haynes, or Frank reported the disclosure to the SCR, to the police, or any other authorities. *Id.* ¶¶ 279–82. They also did not take any steps to treat the trauma Juan Rodriguez had caused, telling Plaintiff that obtaining counseling would require too much paperwork, and covered up Plaintiff's disclosure, acting as if it had never occurred. *Id.* ¶¶ 283–84.

Similarly, Defendants HeartShare, Barnwell, Lewis, and Ellis reinforced Plaintiff's traumatic conditioning when Plaintiff disclosed Gary Hoyte's sexual abuse during personal meetings with Lewis at HeartShare's offices. *Id.* ¶ 285. Despite Ellis herself having been sexually harassed by Hoyte during home visits, these defendants dismissed Plaintiff's complaints, failed to report her disclosure to authorities, took no steps to investigate or revoke Hoyte's certification, and refused to provide her with any therapeutic support or counseling services. *Id.* ¶¶ 286-89. Instead, they covered up Plaintiff's disclosure by acting as if it had never happened, thereby reinforcing the pattern of silence and denial that Plaintiff had experienced throughout her time in foster care. *Id.* ¶ 290.

The explicit message Plaintiff received from her abusers that she should deny the abuse, coupled with the repeated inaction and cover-ups engaged in by her foster care providers including the Concord doctor and Defendants Concord, Floyd, Diggs, Harris, Haynes, Frank, HeartShare, Barnwell, Lewis, and Ellis, convinced Plaintiff that disclosure of sexual or physical abuse she experienced in foster care was largely futile, and thereby dissuaded her from taking timely legal action to protect her rights. *Id.* ¶ 291.

As a direct result of the sexual and physical abuse that Plaintiff suffered in foster care, Plaintiff developed severe psychological conditions including posttraumatic stress disorder (PTSD) and depression, which continue to profoundly impact Plaintiff's functioning. *Id.* ¶ 292. These conditions manifest as intrusive memories, flashbacks, emotional distress, and severe anxiety when confronted with reminders of the abuse, leading Plaintiff to engage in avoidance behaviors as a coping mechanism. *Id.* ¶ 293. The abuse also caused Plaintiff to develop a profound sense of helplessness and futility about her ability to effect change, which, together with depression and other cognitive difficulties, created a persistent psychological barrier to believing that legal action was possible or worthwhile. *Id.* ¶¶ 294-95. This sense of futility was caused at least in part by defendants' cover-ups and their utter failure to help Plaintiff address her trauma. *Id.* ¶ 296. When Plaintiff considered commencing legal action in 2013, she found herself incapable of doing so due to the extreme mental and emotional distress triggered by re-experiencing memories of the abuse and defendants' dismissive responses. *Id.* ¶ 297. The combined psychological impact of her traumatic experiences created extraordinary circumstances that directly impaired Plaintiff's ability to take timely legal action against those responsible for her abuse. *Id.* ¶ 298.

## ARGUMENT

### POINT I: THE COURT SHOULD PUT AN END TO DEFENDANTS' DELAY TACTICS AND ALLOW THIS CASE TO PROCEED TO DISCOVERY

This Court has already refused to dismiss Plaintiff's case, determining that at least some of her claims state causes of action. *See* Mem. & Order, ECF No. 254. Discovery has commenced, though it has now been stayed by the magistrate judge pending resolution of these motions. *See* Order dated June 13, 2025. Federal courts generally disfavor "fragmentary disposal of what is essentially one matter," which is "unfortunate not merely for the waste of time and

expense caused the parties and the courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue." *Audi Vision Inc. v. RCA Mfg. Co.*, 136 F.2d 621, 625 (2d Cir. 1943). When "one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted." *Chisholm-Mitchell v. Ahmed*, No. 20-CV-3434 (PKC) (LB), 2021 WL 512460, at *4 (E.D.N.Y. 2021); *accord Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 241–42 (E.D.N.Y. 2015); *Thibodeaux v. Travco Ins. Co.*, No. 13–CV–5599, 2014 WL 354656, at *2 (E.D.N.Y. Jan. 31, 2014); *Friedman v. N.Y.C. Admin. for Child.'s Servs.*, No. 04–CV–3077 (ERK), 2005 WL 2436219, at *9 (E.D.N.Y. 2005).

In their current motions, Defendants have ignored the provision of Federal Rule of Civil Procedure 8(a)(2), which requires that the complaint give only a short and plain statement of the claim. In particular, "[s]pecific facts are not necessary . . . ." *Ericson v. Pardus*, 551 U.S. 89, 93 (2007). Rather, "the statement [of the claim] need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 555). Defendants, however, criticize the Fourth Amended Complaint for failing to include the smallest of evidentiary facts, including facts which are undisputed.

Thus, the HeartShare Defendants spend two pages griping that Plaintiff failed to allege that HeartShare "possessed or was made aware of" the information in Dolores Shore's file, implying that HeartShare did not have the information. *See* HeartShare Defs.' Mem. at 9–10. That statement is misleading to the point of mendacity. HeartShare has already admitted that it possessed the Shore file, having produced that file in discovery in the case of Plaintiff's sister, *Diamond Jewels v. Lewis*, 15-cv-5760 (KAM)(ST). At the time, Defendant HeartShare was

represented by the same law firm which now represents it in the instant case. *See* Decl. of

Carolyn A. Kubitschek in Opp. to Defs.' Mots. to Dismiss Fourth Amend. Compl. ¶¶ 3–6.

**POINT II: PLAINTIFF'S FOURTH AMENDED COMPLAINT STATES A CLAIM FOR NEGLIGENT SUPERVISION AND RETENTION AS TO ALL DEFENDANTS**

As the New York Court of Appeals recently reaffirmed, the government "owes a duty of

care to safeguard those in its custody. . . ." *Weisbrod-Moore v. Cayuga County*, No. 7, 2025 WL

515393, at *3 (N.Y. Feb. 18, 2025) (internal quotes omitted). That affirmative common law duty

of safe-keeping applies to the government's foster children as well as to its prisoners. *Id*. Having

assumed "legal custody over a foster child, a municipality necessarily owes a duty to the child

greater than that owed to the public generally." *Id.* Specifically, "a municipality owes a duty to a

foster child over whom it has assumed legal custody to guard the child from foreseeable risks of

harm arising from the child's placement with the municipality's choice of foster parent." *Id.* The

rationale underlying that special duty is that, "[b]y assuming legal custody over the foster child,

the applicable government official steps in as the sole legal authority responsible for determining

who has daily control over the child's life." *Id.* The child herself is "incapable of pursuing other

avenues of protection and without a competent adult family member advocating on [her] behalf."

*Id.*

Contrary to Concord Defendants, *see* Concord Defs.' Mem. at 8, Plaintiff does not rely

upon any section of the Social Services Law to provide a cause of action for Defendants' failure

to protect her from harm while she was in foster care; that claim is based upon Defendants'

negligence. Defendants' violation of statutes that impose "a specific duty constitutes negligence

per se, or may even create absolute liability." *Elliott v. City of New York*, 95 N.Y.2d 730, 734

(2001) (citing *Van Gaasbeck v. Webatuck Cent. Sch. Dist. No. 1*, 21 N.Y.2d 239, 243 (1967)).

That Defendants violated statutes which the New York legislature enacted to protect children makes defendants per se liable for their negligence.

Those statutory violations include improperly certifying Maria and Juan Rodriguez as foster parents, improperly re-certifying Maria and Juan Rodriguez as foster parents each year, overcrowding the Rodriguez foster home, improperly placing plaintiff and her siblings in the Rodriguez foster home, improperly certifying Debra Shields as a foster parent, and improperly recertifying Debra Shields as a foster parent each year, improperly placing plaintiff in the foster home of a recidivist child abuser, as well as statutory violations concerning Dolores Shore and Gary Hoyte. *See* FAC ¶¶ 73–86, 139–50, 182–97, 200–25, 325–26.

To implement its affirmative duty to protect the foster children in its municipalities' custody from foreseeable risks of harm arising from the municipalities' chosen foster parents, the State of New York enacted statutes and promulgated regulations designed to protect foster children. All foster parents must be licensed or certified annually. *See* N.Y. Soc. Serv. Law §§ 377–78. Detailed licensing and certification rules assist agencies in keeping abusive and neglectful individuals from becoming foster parents. *See* N.Y. Comp. Codes R. & Regs. tit. 18, §§ 443.1–443.12. For example, individuals who have been convicted of violent or drug-related felonies are barred from serving as foster parents. *See* N.Y. Soc. Serv. Law § 378-a(2)(e)(1). Individuals whose households include convicted criminals are barred from serving as foster parents unless the authorized agency,[3] after conducting a safety assessment of the home, takes "all appropriate steps to protect the health and safety of" the foster children, which may include removing the foster children from the home. *Id.* § 378-a(2)(h). Foster care agencies must conduct

---

[3] All municipal "social services officials" are "authorized agencies," N.Y. Soc. Serv. Law § 371(10)(b), as are the not-for-profit organizations which provide care for foster children pursuant to contracts with the municipalities. *See id.* § 371(10)(a).

criminal history checks on all prospective foster parents, and all individuals over the age of eighteen who reside in the foster parents' households. *See id.* § 378-a(1).

Detailed statutes and regulations govern the details of foster homes, *see, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 18, § 443.3(a), and limit the number of children whom a foster parent may care for. *See* N.Y. Soc. Serv. Law §§ 377–78. New York law also protects foster children by requiring agency staff to supervise foster children, foster parents, and foster homes on a regular and continuing basis. *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 18, § 441.21.

Whether an agency has negligently failed to comply with its statutory and regulatory duties to safeguard its foster children is an issue invariably based upon information known to the agency but not to the foster children themselves. While foster care agencies are required to keep detailed records of their activities concerning the foster children and the foster parents, those records are confidential, *see* N.Y. Soc. Serv. Law § 372(3), and cannot be accessed by the foster children themselves. Consequently, a child who has been abused in foster care normally will not have access to the detailed factual evidence regarding the foster care agency's negligent actions or omissions that caused the abuse to take place. That evidence is in the sole possession of the agency.

In evaluating a complaint, the federal rules require only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In particular, "[s]pecific facts are not necessary . . . ." *Ericson*, 551 U.S. at 93. Rather, "the statement [of the claim] need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 555).

That rule of pleading is particularly true in cases where the "facts are peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120

(2d Cir. 2010). In the instant case, while the facts of the injuries that Plaintiff suffered are within her knowledge, the facts as to Defendants' liability are peculiarly within the possession and control of the defendants. Plaintiff was a child of eight years when her foster father Juan Rodriguez began sexually assaulting her. Plaintiff was ten years old when she was abused by the adolescent in the Shields home. She had minimal knowledge or notice of the acts or omissions of the Defendants that failed to protect her from those assaults. By contrast, the Defendants kept detailed records documenting their actions and omissions, as the law required of them. And the individual defendants are available for depositions to further clarify the facts.

Plaintiff is not required to allege that Defendants had prior notice or knowledge of the abuse that any of the perpetrators inflicted on plaintiff. *See* City Defs.' Mem. at 6; Concord Defs.' Mem. at 6; HeartShare Defs.' Mem. at 5, 7. As this Court has already ruled, "knowledge of prior accusations of abuse, or actual abuse," is not necessary in order for a plaintiff to "demonstrate a third-party's propensity to engage in sexual abuse, . . ." Mem. & Order, ECF No. 254, at 43.

It is thus sufficient that a plaintiff allege that the defendant "knew or should have known of the [perpetrator's] propensity for the conduct which caused the injury." *MCVAWCD-DOE v. Columbus Ave. Elementary Sch.*, 225 A.D.3d 845, 846 (2d Dept 2024); *accord Grabowski v. Orange County*, 219 A.D.3d 1314, 1315 (2d Dept 2023). Once a plaintiff makes that allegation, the burden shifts to the defendant to "establish, prima facie, that it lacked notice of the counselor's alleged abusive propensities and conduct." *Kwitko v. Camp Shane, Inc.*, 224 A.D.3d 895, 896 (2d Dept 2024).

Since foster care agencies have an affirmative obligation to protect the children in their legal custody from abuse, the agencies have the burden of proving that they have complied with

their obligation. Moreover, the rule mirrors the federal pleading rule that plaintiffs do not have to plead "facts are peculiarly within the possession and control of the defendant." *Arista Records*, 604 F.3d at 120. That rule also mirrors the federal pleading rule that in other burden-shifting cases, specifically cases based upon discrimination, a plaintiff does not have to "plead facts sufficient to establish a prima facie disparate treatment claim." *Boykin v. KeyCorp.*, 521 F.3d 202, 212 (2d Cir. 2008) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)).[4]

Specifics as to the City's knowledge about the boy in the Shields home who sexually assaulted Plaintiff, including his propensity to engage in sexually assaultive behavior, *see* City Defs.' Mem. at 5–6, is "peculiarly within the possession and control" of the City and contained in its foster care records on the assailant. *See Arista Records*, 604 F.3d at 120. In *Read v. Corning Inc.*, 371 F. Supp. 3d 87, 92 (W.D.N.Y. 2019), cited by the City, information concerning the toxicity of various chemicals found in the soil was a matter of general scientific knowledge, and not within the sole possession or control of the defendant.

Likewise, Plaintiff is not required to include "factual enhancement" of its claims that individual Concord defendants knew or should have known of Juan Rodriguez's propensity to sexually assault girls or the propensity of the adolescent foster boy in the Shields home to sexually assault girls. *See* Concord Defs.' Mem. at 7. Rule 8 does not require the pleading of specific facts, *see Ericson*, 551 U.S. at 93, especially when the specific facts are peculiarly in the possession and control of the defendant. *Arista Records*, 604 F.3d at 120. In a Child Victim's Act case, it is legally sufficient to plead that the defendants knew or should have known of the perpetrator's propensity, as plaintiff pleaded here. *Kwitko*, 224 A.D.3d at 896; *see also* Pl.'s

---

[4]     *Swierkiewicz* is still good law, having been cited with approval by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and thereafter in *Jones v. Bock*, 549 U.S. 199, 213 (2007), and *Johnson v. City of Shelby, Mississippi*, 574 U.S. 10, 11 (2014).

Consolidated Mem. of Law in Opp. to the Mots. to Dismiss Pl.'s Third Amend. Compl., ECF No. 240, at 9–15.

Concord Defendants' claim that they "could not have reasonably anticipated the third-party acts at issue," Concord Defs.' Mem. at 8, is an assertion that they were not negligent and a challenge to the *accuracy* of the statements in the complaint, not to the *adequacy* of those statements. That challenge is for the jury to determine. *See Mirand v. City of New York*, 84 N.Y.2d 44, 51 (1994). Similarly, HeartShare's claim that its negligent failure to comply with its statutory obligation to conduct criminal background checks on Max Shore did not cause harm to Plaintiff, *see* HeartShare Defs.' Mem. at 11–12, raises the issue of causation. But causation "is a question of fact for the jury," *Mirand*, 84 N.Y.2d at 51, not a question for the court on a motion to dismiss. Finally, the City Defendants' claim as to what a plaintiff must "establish" on a motion for summary judgment, *see* City Defs.' Mem. at 5 (citing *Lopez v. City of New York*, 172 A.D.3d 703, 705 (2d Dept. 2019)), does not apply at the pleading stage.

### A. Abuse in the Rodriguez home.

Contrary to Concord Defendants, *see* Concord Defs.' Mem. at 7, the Fourth Amended Complaint does not "lump" Concord Defendants together. Instead, it identifies "which defendant is responsible for what conduct," *id.*, as not all of the Concord Defendants are responsible for all of the misconduct. *See* FAC ¶¶ 75–89 (identifying the Concord Defendant who participated in which wrongful conduct). Thus, the Fourth Amended Complaint enables the Concord defendants to "reasonably understand[] the theories of liability asserted against them." *Agudelo v. Recovo Mortgage Management, LLC*, No. 22-cv-4004 (JMA)(LGD), 2025 WL 1674486, at *17 (E.D.N.Y. June 13, 2025). Regardless of their different positions in Concord Family Services, each of the Concord Defendants had a legal obligation to "exercise the highest degree of

reasonable care to protect Plaintiff from foreseeable harms, including sexual and physical abuse, when she was a child in foster care" in the care of defendant Concord. FAC ¶ 68. Each of the identified Concord Defendants failed to exercise reasonable care, causing Plaintiff to be abused while in the Rodriguez and Shields foster homes. All of the Concord defendants were required to report suspected child abuse. FAC ¶¶ 33(jj), 88–89, 107–08. None of them reported the abuse of Plaintiff. *See id.* ¶¶ 89–92, 94, 98, 105, 108, 124, 127–28.

This Court has already ruled that plaintiffs' statements against Defendant City are legally sufficient to state a claim against defendant City. *See* Mem. & Order, ECF No. 254. In her Third Amended Complaint, Plaintiff included analogous claims against Defendant Concord, (which is currently in default), Defendant Concord being legally responsible, under respondeat superior, for the actions of individual Concord Defendants. The Fourth Amended Complaint details the negligent actions and omissions of the individual Concord Defendants in the same manner as the claims which this Court upheld against the City in the Third Amended Complaint.

### B. Abuse in the Shields home.

Plaintiff does not base her claim against the City solely on the City's failure to revoke "foster care certification of Debra Shields" after Shields was found to have abused a foster child in 2002, *see* City Defs.' Mem. at 6, but also states that the City should not have placed "any more foster children with Debra Shields," including Plaintiff. FAC ¶ 149. The placement of Plaintiff in the home of a recidivist child abuser led to the abuse of Plaintiff herself. *Id.* ¶¶ 150, 163–66. Shields was guilty of improper supervision and inadequate guardianship in failing to supervise the foster children in her home, allowing the older ones free rein to assault the younger ones, including Plaintiff. *Id.* ¶¶ 162, 166. Shields' confirmed abuse and maltreatment legally disqualified her from caring for any more foster children, including Plaintiff, *id.* ¶¶ 139–42, 146–

49, and the City was not merely negligent but reckless in placing plaintiff and her siblings in that abusive home. *Id.* ¶¶ 149–50.

### C. Abuse in the Shore home.

Defendant HeartShare knew that its foster mother Dolores Shore was capable of caring for girls, but not boys, Defendant Concord and the State of New York having determined that Shore not be allowed to care for boys in her foster home. *See id.* ¶¶ 201–04. Despite Ms. Shore's incapacity, Defendants City and Concord had placed two boys in her foster home, Max and Kyle. *Id.* ¶ 205. Later, as Defendant City and Concord Defendants (including Defendant Barnwell) knew and read in Ms. Shore's records, Ms. Shore was not capable of handling children and adolescents who engaged in sexual misbehavior. *Id.* ¶¶ 206–07. HeartShare learned of Ms. Shore's incapability of caring for adolescents who engaged in sexual misbehavior when Ms. Shore's foster home was transferred to HeartShare in 2008. *Id.* ¶¶ 207–08, 217. That information put HeartShare on notice that Kyle and Max had not only a propensity for sexual misconduct but also that they may have actually already engaged in sexual misbehavior and that Ms. Shore had been incapable of controlling that behavior. *Id.* ¶¶ 208, 210–11, 218.

"The standard for determining whether the [entity] has breached its duty is to compare the [entity's] supervision and protection to that of a parent of ordinary prudence placed in the same situation and armed with the same information." *MCVAWCD-DOE*, 225 A.D. at 847. No ordinarily prudent parent would voluntarily put her teenaged daughter into the home of a woman who had been found to be incapable of handling adolescents who engage in sexual misbehavior and was already caring for two older males. At a minimum, the reasonable parent would have (and defendants should have) made a thorough inquiry into exactly what the "sexual misbehavior" had consisted of, and which of the males in the home had engaged in that behavior.

HeartShare's placement of Plaintiff in the Shore home, where Dolores Shore was known to be incapable of protecting children from sexually aggressive adolescents, without making any inquiry whatsoever, was not merely negligent but reckless.

When Max Shore turned eighteen in 2009, HeartShare was statutorily required to conduct a criminal background check on him. *See* N.Y. Soc. Serv. Law § 378-a(2)(a). That check would have revealed his criminal record and would have required HeartShare to investigate further to determine whether adolescent girls could safely be placed in the same home where Max Shore resided. FAC ¶¶ 216, 221–22. The requirement of such a criminal background check is to protect foster children from having to live under the same roof as criminals. *Id.* ¶¶ 223–24. However, HeartShare failed to conduct any such check of Max Shore, thus turning a blind eye to the danger that Max Shore posed to Plaintiff. *Id.* ¶ 222.

The requirement to conduct a criminal background check on Max Shore was particularly important, as HeartShare was aware that Max's older brother Kyle had been convicted of armed robbery and imprisoned before returning to live in the Shore home. *Id.* ¶¶ 215, 219. The failure of HeartShare and the City to conduct the background check violated a statute that was enacted to protect children. That failure constituted negligence. "Violation of a State statute that imposes a specific duty constitutes negligence per se, or may even create absolute liability." *Elliott*, 95 N.Y.2d at 734 (citing *Van Gaasbeck*, 21 N.Y.2d at 243).

Contrary to HeartShare, *see* HeartShare Defs.' Mem. at 6, the facts supporting Max and Kyle Shore's propensity for engaging in "sexual violence and abusive sexual behavior" are in fact contained in HeartShare's own records. FAC ¶¶ 208, 218. The assessment by professionals that Dolores Shore was not capable of handling children and adolescents who engaged in sexual misbehavior was necessarily based upon facts, i.e., the facts that (1) adolescents who were in

Dolores Shore's care (and hence under her supervision) had engaged in sexual misbehavior and (2) Dolores Shore had failed to handle that misbehavior. *Id.* ¶¶ 207–08, 211. That information required, at a minimum, that HeartShare carefully investigate the misconduct and Shore's inadequate response before placing young children in the home. HeartShare failed to do so. That is not a "threadbare recital" of elements of a cause of action. HeartShare Defs.' Mem. at 6. That is a factual account contained in HeartShare's own records.

In June 2010 (after plaintiff had been removed from the Shore home), Dolores Shore's adopted son Kyle engaged in felonious sexual misbehavior with plaintiff's sister, who had remained in that home: he tried to rape her. *See* FAC ¶¶ 226–28. His violent sexual assault reinforced what HeartShare already should have known—that the Shore foster home was dangerous, that young people who were supposed to be under Dolores Shore's supervision engaged in "sexual misbehavior," and that Dolores Shore herself was an incompetent foster mother who was incapable of curbing that "sexual misbehavior." *Id.* ¶¶ 207–08, 211. Instead of taking steps to ensure that Dolores Shore's home was made safe for other foster children, Defendant HeartShare and its employees did just the opposite—they protected the perpetrator with the violent felony conviction by failing even to accompany the victim to the police station to be interviewed, to make a formal complaint, and to launch a criminal investigation. *Id.* ¶¶ 229–30. And a few months later, defendant HeartShare placed plaintiff back in the Shore foster home, to reside with the incompetent foster mother and her two predator sons. *Id.* ¶ 231.

Contrary to the claim that HeartShare had no "reason to suspect that Max Shore . . . posed a risk" to Plaintiff, HeartShare Defs.' Mem. at 7, the complaint states that teenagers living in Ms. Shore's foster home had engaged in "sexual misbehavior" that Ms. Shore was incompetent to curb. FAC ¶ 208. Thus, HeartShare was on notice that either Kyle Shore or Max Shore (who

were the only young people in Ms. Shore's home at the time) had engaged in "sexual misbehavior" with foster children in Ms. Shore's home. Moreover, by protecting Kyle Shore from accountability for his assault on Plaintiff's sister, HeartShare and City Defendants let Max Shore know that girls in the foster home could be sexually assaulted with impunity, emboldening him to continue in his brother's felonious footsteps. *Id.* ¶ 225.

HeartShare's negligence is not based solely on "conflat[ing] the conduct or knowledge of one individual with that of another . . . ." HeartShare Defs.' Mem. at 7. Rather, HeartShare's negligence, like that of the City (contrary to the City's claim, *see* City Defs.' Mem. at 6), is based upon its failure to act, or even investigate, when it knew that adolescents in Dolores Shore's foster home had been engaging in "sexual misbehavior" and that Dolores Shore was incompetent to protect the victims of that "sexual misbehavior." HeartShare had been advised (in writing) that there had been prior instances of sexual misbehavior in Dolores Shore's home, that Dolores Shore was incompetent to curb that misbehavior or protect the victims of that misbehavior, that two potential perpetrators of that misbehavior were living in Dolores Shore's home at the time HeartShare and the City placed plaintiff in that home, that one of those potential perpetrators was a convicted violent felon, and that the other may have had a criminal record which HeartShare and the City should have checked but did not. HeartShare and the City also knew that one of the two potential perpetrators of that misbehavior had committed a violent sexual assault upon plaintiff's younger sister, but HeartShare had protected the perpetrator of the violent sexual assault from being brought to justice. HeartShare and the City's second placement of plaintiff in that home was irresponsibly negligent.

While admitting that HeartShare's director of foster care, Defendant Natalie Barnwell, learned of the information in the Shore file while Barnwell was employed by Defendant

Concord, HeartShare claims that liability cannot be imposed upon HeartShare "based on allegations directed only at" Barnwell. HeartShare Defs.' Mem. at 10. That curious statement overlooks the doctrine of respondeat superior, which imposes liability upon HeartShare for the negligent acts and omissions of its director of foster care. *See, e.g.*, *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979).

HeartShare failed to conduct a criminal background check on Max Shore, and consequently failed to learn of Max Shore's extensive criminal record. Max Shore's criminal record, like Kyle Shore's conviction of a violent felony, would have disqualified Ms. Shore from caring for additional foster children, including Plaintiff. *See* N.Y. Soc. Serv. Law § 378-a(2)(a); N.Y. Comp. Codes R. & Regs. tit. 18, § 443.8(g)(2). When combined with the information in the Shore records and Max Shore's propensity for sexual misconduct, the complaint states a claim.

Plaintiff categorically rejects the claim that "lesser allegations of prior wrongdoing are insufficient to state a negligent supervision claim predicated on sexual assault." HeartShare Defs.' Mem. at 10. If a defendant, aware that one of his employees has engaged in sexual misconduct against another employee in an inferior position, takes no action to stop the misconduct, it is foreseeable that the misbehaving employee will not only continue the misconduct, but also escalate the misconduct.[5]

---

[5]     To the extent that the statement that "a propensity to sexually harass is not sufficient to establish a propensity to sexually assault," *Lee v. Albarran*, No. 23-cv-11215 (NSR), 2024 WL 4987310, at *6 (S.D.N.Y. Dec. 5, 2024), may be read to hold that an employer escapes liability for negligent supervision of one of his employees when he knows or should have known that the employee had sexually harassed other employees but did not know that the miscreant employee would sexually assault other employees, that statement is contrary to the law of the State of New York. The "argument that a background check would have revealed a propensity for violence, but not a propensity for sexual violence, is not dispositive, since it cannot be said that, as a matter of law, it is unforeseeable that a person with convictions for assault would commit a sexual assault when placed in a setting such as this Center." *T.W. v. City of New York*, 286 A.D.2d 243, 245 (1st Dept 2001).

Had HeartShare conducted the statutorily-required criminal background check on Max Shore, HeartShare would uncovered Max Shore's extensive criminal record. FAC ¶ 216. That information would have statutorily required HeartShare to conduct a safety assessment of the home and take "all appropriate steps to protect the health and safety of" foster children, which would include keeping plaintiff out of that home. *See* N.Y. Soc. Serv. Law § 378-a(2)(h).

### D. Abuse in the Hoyte home.

Contrary to the City, *see* City Defs.' Mem. at 6, Plaintiff's claims concerning Gary Hoyte's abuse are in paragraphs 317–22 of the Fourth Amended Complaint as well as paragraph 181. Hoyte's abuse was foreseeable because the City Defendants knew or should have known that Hoyte had a propensity for the conduct which caused injury to Plaintiff. *See* FAC ¶¶ 321–22.

Plaintiff's FAC also includes new allegations detailing how during the six-month period in late 2008 or early 2009 when Gary Hoyte's inappropriate sexual conduct was ongoing, she met with Defendant Lewis in person at HeartShare's offices several times and explained to Lewis that Gary Hoyte regularly sexually abused and harassed her. *See id.* ¶ 196. Despite this, neither Lewis, Barnwell, Ellis, nor any other HeartShare employees took action to protect her. *Id.* ¶ 197. HeartShare Defendants do not challenge the sufficiency of those allegations against Defendant Lewis.

### POINT III: PLAINTIFF STATES CLAIMS FOR NEGLIGENT AND STATUTORY FAILURE TO REPORT CHILD ABUSE AGAINST ALL DEFENDANTS

As this Court has already recognized, certain professionals have both a common law and a statutory duty to report suspected child abuse to the New York State Central Register of Abuse and Maltreatment. *See* Mem. & Order, ECF No. 254, at 29–30. That duty applies to all of the Defendants in the instant case. *See* FAC ¶ 33(jj).

Contrary to the City's claims, *see* City Defs.' Mem. at 7–8, in *BL Doe 5 v Fleming*, 199 A.D.3d 1426, 1427 (4th Dept 2021), the defendant school personnel did not have a duty to report the abuse of the plaintiff child because the child, who was abused outside of school hours and off of school property, did not come "before them in their professional or official capacity." N.Y. Soc. Serv. Law § 413(1)(a). A school's obligation to protect its students is limited to the time that the children are in the school:

> The school's duty is thus coextensive with and concomitant to its physical custody of and control over the child. When that custody ceases because the child has passed out of the orbit of its authority in such a way that the parent is perfectly free to reassume control over the child's protection, the school's custodial duty also ceases.

*Pratt v. Robinson*, 39 N.Y.2d 554, 560 (1976). Here, Plaintiff was abused while in the custody of Defendant City. As the City employees who supervised Plaintiff's foster care, Defendants Casner, Cruz, and Antonsanti each had a duty to report the victimization of the Plaintiff. Their failure to do so is actionable under the common law and under Social Services Law § 420.

Contrary to Concord Defendants' argument, *see* Concord Defs.' Mem. at 6, the complaint does not have to plead specific provisions of New York's reporting statutes. "Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Mississippi*, 574 U.S. 10, 11 (2014). Plaintiff is thus not required to allege that New York law requires certain professionals, including all of the Defendants in the instant case, to make reports to the New York State Central Register of Child Abuse and Maltreatment when they have "reasonable cause" to suspect that a child has been abused or maltreated. N.Y. Soc. Serv. Law § 413(a). Nor is Plaintiff required to allege that, as a matter of law, probable cause (to arrest, not merely to report) exists when an official is "advised of a crime by a person who claims to be the victim," *Singer v. Fulton County Sheriff*, 63

F.3d 110, 119 (2d Cir. 1995), or an eyewitness. *See United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006).

Plaintiff's complaint states that the victims of or eyewitnesses to child abuse advised the Concord Defendants, among others, of incidents of child abuse which the Concord Defendants failed to report to the SCR. *See* FAC ¶¶ 107–08. The complaint is not required to allege the legal conclusion that victims' or eyewitnesses' statements gave the Defendants probable cause to suspect child abuse, or even reasonable cause, requiring defendants to make reports.

## POINT IV: EQUITABLE TOLLING SHOULD BE APPLIED TO PLAINTIFF'S CONSTITUTIONAL CLAIMS

The doctrine of equitable tolling "permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity." *Doe v. United States*, 76 F.4th 64, 71 (2d Cir. 2023); *accord Clark v. Hanley*, 89 F.4th 78, 93–99 (2d Cir. 2023). Where, as here, a civil rights plaintiff raises a claim of equitable tolling of the statute of limitations, the court must make an individualized factual determination as to whether the statute of limitations has been tolled for that particular plaintiff, based upon the facts of that particular case. *Doe*, 76 F.4th at 72.

In general, "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). "The term 'extraordinary' refers . . . to the severity of the obstacle impeding compliance with a limitations period." *Smalls v. Collins*, 10 F.4th 117, 125 (2d Cir. 2021) (quoting *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011)). The new allegations included in Plaintiff's Fourth Amended Complaint sufficiently demonstrate that she is entitled to equitable tolling of the statute of limitations on her claims arising under 42 U.S.C. § 1983.

**A. Plaintiff has diligently pursued her rights.**

The Supreme Court has cautioned against the application of "an overly rigid . . . approach" to the diligence requirement. *Holland v. Florida*, 560 U.S. 631, 653 (2010). "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Id.* (citations omitted) What can reasonably be expected from a particular plaintiff depends on the nature of the circumstances they face. *See Doe*, 76 F.4th at 73 Here, given the circumstances Plaintiff faced, she pursued her rights as diligently as she could have.

As Plaintiff's Fourth Amended Complaint details, beginning from a very young age, she suffered many years of heinous sexual and physical abuse while in foster care, which caused her to develop severe psychological conditions, including posttraumatic stress disorder (PTSD) and depression, which continue to profoundly impact her functioning. *See, e.g.*, FAC ¶¶ 292–93. Notwithstanding these extraordinary circumstances, Plaintiff managed to timely file an initial lawsuit within the original statute of limitations period after signing herself out of foster care. *See* Complaint, *Roldan v. Casner*, No. 13-cv-02950-KAM-RER (E.D.N.Y. May 20, 2013), ECF No. 4.[6] However, given the extreme mental and emotional distress Plaintiff felt at that time upon re-experiencing the memories of her abuse and the dismissive responses of Defendants, she found herself utterly incapable of continuing the action at that time and withdrew it. *See* FAC ¶¶ 292–98; Notice of Voluntary Dismissal, *Roldan v. Casner*, No. 13-cv-02950-KAM-RER (E.D.N.Y. Oct. 31, 2013), ECF No. 4. When the Child Victims Act later opened a lookback period and seven years had afforded Plaintiff sufficient distance from the abuse to not feel as paralyzed as before, she timely filed the instant lawsuit within the period permitted by the new law. *See* ECF

---

[6]     In considering a motion to dismiss, courts "may take judicial notice of documents filed in related litigation by a plaintiff." *Reyes v. Fairfield Properties*, 661 F. Supp. 2d 249, 255 n.1 (E.D.N.Y. 2009) (collecting cases).

No. 1; *cf. also S.H. v. Diocese of Brooklyn*, 205 A.D.3d 180, 186 (2d Dept 2022) (observing that the Child Victims Act is a "legislative acknowledgment of the unique character of sex crimes against children, which can have a multitude of effects upon victims, including being justifiably delayed in otherwise timely taking action against their abusers and/or those who facilitated their abuse").

Much like in *Doe*, then, "this is not a case where the plaintiff failed to exercise diligence 'without any valid justification.'" 76 F.4th at 73 (quoting *Pace*, 544 U.S. at 419). Rather, the Court here acting in a fact-finding capacity could reasonably determine that "the fear and psychological impact caused by [the abuse Plaintiff suffered] prevented [her] from being able to begin seeking redress for several years after the abuse ended, but that as soon as she was able to, she began taking steps to vindicate her rights." *Id.* Given the heinous abuse that Plaintiff suffered in foster care and the lasting psychological impact, she acted "as diligently as reasonably could have been expected *under the circumstances*." *Baldayaque v. United States*, 338 F.3d 145, 153 (2d Cir. 2003) (emphasis in original).

**B. Plaintiff's FAC also sufficiently demonstrates that extraordinary circumstances stood in the way of her earlier pursuing her claims.**

Some victims of sexual and physical assault are so traumatized by their experiences that they remain unable to file lawsuits for redress until long after the period of limitations has expired. *See S.H.*, 205 A.D.3d at 186. Others, like the plaintiff in *Doe*, are unable to pursue justice because the defendants' actions interfered with their ability to proceed. *See* 76 F.4th at 71–72; *cf. S.H.*, 205 A.D.3d at 186 ("In enacting these reforms the legislature also recognized that certain abusers—sometimes aided by institutional enablers and facilitators—have been successful in covering up their heinous acts against children."). Plaintiff's situation falls into both categories.

### 1. The profound psychological impact of severe abuse and institutionalized silencing prevented Plaintiff from pursuing timely legal action.

Courts "have recognized that the psychological impact of long-term or extreme sexual abuse can constitute an extraordinary circumstance that prevents a victim from coming forward even for some time after the abuse has ceased." *Doe*, 76 F.4th at 72 (citing *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999) and *Kennedy v. Berkel & Co. Contractors, Inc.*, 319 F. Supp. 3d 236, 251–52 (D.D.C. 2018)).

Here, Plaintiff suffered the psychological impact of long-term, extreme sexual abuse and harassment that created profound barriers to her pursuit of justice. As detailed in her FAC, Plaintiff experienced repeated sexual assault and physical abuse from multiple perpetrators over many years while in foster care. *See generally* FAC ¶¶ 90–102 (Juan Rodriguez's regular sexual abuse and Maria Rodriguez's persistent physical abuse); *id.* ¶¶ 163–66 (sexual assault by adolescent boy in Shields home); *id.* ¶¶ 188–93 (Gary Hoyte's repeated sexual abuse and harassment); *id.* ¶¶ 232–34 (Max Shore's sexual assaults and attempted rape).

From an early age, Plaintiff was also systematically conditioned to remain silent about her abuse, which was reinforced throughout her time in foster care. Maria Rodriguez explicitly instructed Plaintiff to deny the abuse if anyone asked her about it and to pretend it was all just a dream. *Id.* ¶ 276. More significantly, Maria Rodriguez threatened to kill Plaintiff if she reported the sexual abuse to anyone, and employed severe physical abuse to reinforce the threats and ensure Plaintiff's silence, including by beating Plaintiff with metal rods, baseball bats, tree branches, spoons, wires, and hangers on a near daily basis. *Id.* ¶ 277. This conditioning created such a profound psychological barrier that for many years, Plaintiff was unable to speak about the abuse she had suffered. *Id.* ¶ 278.

As a direct result of the abuse she suffered in foster care, Plaintiff developed severe psychological conditions including posttraumatic stress disorder (PTSD) and depression, which continue to profoundly impact her functioning. *Id.* ¶ 292. These conditions manifest as intrusive memories, flashbacks, emotional distress, and severe anxiety when confronted with reminders of the abuse, leading Plaintiff to engage in avoidance behaviors as a coping mechanism. *Id.* ¶ 293. The abuse caused Plaintiff to endeavor to forget the profound trauma that she had experienced in her foster care placements as a coping mechanism for managing that trauma. *Id.* ¶ 294. It also led Plaintiff to develop a profound sense of helplessness and futility about her ability to effect change, which, together with depression and other cognitive difficulties, created a persistent psychological barrier to believing that legal action was possible or even worthwhile. *Id.* ¶¶ 294–96.

Studies demonstrate that survivors of child sexual abuse often delay disclosure for years or even decades, and that 60–80% of survivors do not disclose their abuse until adulthood. *Id.* ¶ 273. Victims abused by family members or caregivers, like Plaintiff, often delay disclosure significantly longer than those abused by non-relatives. *Id.* The circumstances here created precisely the type of severe psychological obstacle recognized in *Doe* and other authorities as constituting extraordinary circumstances. *See* 76 F.4th at 71–73.

2. **Defendants' wrongful actions and omissions systematically interfered with Plaintiff's ability to pursue her claims.**

Government misconduct is "one example of the circumstances under which equitable tolling is appropriate." *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 183 (2d Cir. 2008). In the instant case, over a period of years, defendants repeatedly undermined Plaintiff's attempts to obtain justice and reinforced her conditioning to remain silent about abuse.

The pattern of dismissive responses began early and continued throughout Plaintiff's time in foster care. When Plaintiff's brother initially disclosed the Rodriguezes' physical abuse in early 1998, Defendants City, Casner, Antonsanti, Cruz, Concord, Floyd, Diggs, Barnwell, Harris, Haynes, and Frank were advised of the disclosure, yet they all failed to report the suspected abuse to the SCR or take any other action. FAC ¶¶ 104–10. When an eyewitness also provided actual notice of Maria Rodriguez's physical abuse of Plaintiff, and staff at Plaintiff's elementary school later reported that Plaintiff was being abused and neglected, these same Defendants again failed to forward either of these reports to the appropriate authorities or take any corrective action. *Id.* ¶¶ 111–13, 122–24. Even worse, rather than protecting Plaintiff when her father attempted to help, Defendants City, Casner, Antonsanti, Cruz, Concord, Floyd, Diggs, Barnwell, Harris, Haynes, and Frank obtained a court order prohibiting him from going to his children's school and together with HeartShare, continued to bar Plaintiff's father from going to Plaintiff's schools for the duration of her stay in foster care. *Id.* ¶¶ 118–21.

The cover-up continued even after Plaintiff disclosed Juan Rodriguez's sexual abuse to a Concord doctor after leaving the Rodriguez home. *Id.* ¶ 279. Rather than reporting this disclosure to the authorities, neither the doctor nor Defendants Concord, Floyd, Diggs, Harris, Haynes, or Frank reported the disclosure to the SCR, to the police, or any other authorities. *Id.* ¶¶ 279–82. These Defendants also refused to provide any therapeutic support or counseling to Plaintiff, and chose to cover up Plaintiff's disclosure and act as if it had never occurred, as evidenced by their failure to even so much as record the disclosure in Concord's records. *Id.* ¶¶ 282–84.

This pattern repeated during Plaintiff's placement with HeartShare. When Plaintiff disclosed Gary Hoyte's sexual abuse during personal meetings with Defendant Lewis at HeartShare's offices, and despite Defendant Ellis herself having been sexually harassed by Hoyte

during home visits, Defendants HeartShare, Barnwell, Lewis, and Ellis dismissed Plaintiff's disclosure, failed to report it to authorities, took no steps to investigate Hoyte or revoke his certification, and refused to provide Plaintiff with any therapeutic support or counseling services. *Id.* ¶¶ 285–89. Rather, these Defendants covered up Plaintiff's disclosure and acted as if it had never happened, thereby reinforcing the pattern of silence and denial that Plaintiff experienced throughout her time in foster care. *Id.* ¶ 290.

This systematic pattern of dismissing Plaintiff's reports, covering up her disclosures, and refusing to provide help sent a clear message to Plaintiff that disclosure of sexual or physical abuse she experienced in foster care was largely futile, and dissuaded her from taking timely legal action to protect her rights. *Id.* ¶ 291. Thus, the alleged conduct of Defendants here is exactly the type of interference and governmental misconduct that courts have recognized as warranting equitable tolling. *See Valdez*, 518 F.3d at 183. The combined effect of Plaintiff's psychological trauma and Defendants' systematic interference created extraordinary circumstances that directly impaired Plaintiff's ability to take timely legal action against those responsible for her abuse. FAC ¶ 298.

### C. The factual questions surrounding equitable tolling require an evidentiary hearing, not dismissal at the pleading stage.

All Defendants argue that Plaintiff's allegations are insufficient to conclusively establish her entitlement to equitable tolling, *see generally* City Defs.' Mem. at 11–13; Concord Defs.' Mem. at 4–5; HeartShare Defs.' Mem. at 15–16, but this argument misunderstands the law and procedural posture of this case. "Related to the pleading rules for affirmative defenses, equitable tolling often raises fact-specific issues premature for resolution on a Rule 12(b)(6) motion, before a plaintiff can develop the factual record." *Clark*, 89 F.4th at 94. The Second Circuit has repeatedly instructed that equitable tolling determinations are inappropriate for resolution on

motions to dismiss. *See, e.g.*, *Brown v. Parkchester S. Condominiums*, 287 F.3d 58, 60–61 (2d Cir. 2002) (vacating dismissal and ordering evidentiary hearing because "[b]ased on the limited record presented to the district court, it appears there may be substance to [the plaintiff's equitable tolling] claim."); *Valverde v. Stinson*, 224 F.3d 129, 135 (2d Cir. 2000) (vacating dismissal and remanding "to develop further the facts" on equitable tolling claim); *see also Lama v. Malik*, 58 F. Supp. 3d 226, 235 (E.D.N.Y. 2014) (collecting cases suggesting that equitable tolling issues are generally not amenable to resolution on a motion to dismiss).

Assuming that a plaintiff makes a sufficient showing to demonstrate that there may be substance to their claim of equitable tolling, an evidentiary hearing should be conducted to explore the merits. In fact, the Second Circuit has explicitly ordered evidentiary hearings to be held where claims of equitable tolling involved weighing competing inferences or resolving contested factual issues. *See Clark*, 89 F.4th at 95–96; *see also Brown*, 287 F.3d at 60–61 (finding an "evidentiary hearing [to be] appropriate to determine" whether "equitable tolling would be in order"); *Canales v. Sullivan*, 936 F.2d 755, 756 (2d Cir. 1991) (remanding "for an evidentiary hearing to determine if [the plaintiff's] condition warrants equitable tolling"). The Circuit has also determined that district courts have abused their discretion by *not* holding an evidentiary hearing to resolve a plausible claim of equitable tolling. *See Torres v. Barnhart*, 417 F.3d 276 (2d Cir. 2005).

Defendants' arguments that Plaintiff has not provided sufficient factual detail to support a claim of equitable tolling actually counsel in favor of the need for an evidentiary hearing or further discovery rather than dismissal. The determination of whether Plaintiff's psychological trauma and Defendants' interference constituted extraordinary circumstances requires factual development that cannot be resolved solely on the pleadings. Questions about the extent and

impact of Plaintiff's trauma, the precise nature of Defendants' conduct and its effect on

Plaintiff's ability to seek legal redress, and the causal relationship between these circumstances

and Plaintiff's delayed filing are all factual inquiries that require hearing testimony and evidence.

As the Second Circuit emphasized in *Clark*, district courts have "wide latitude to

determine the scope of discovery" and should afford parties "a meaningful opportunity to

establish the facts necessary to support" their equitable tolling claims. 89 F.4th at 103. Here,

where Plaintiff has alleged facts that, if proven, would support equitable tolling under Second

Circuit precedent, dismissal at the pleading stage is improper.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the motions to dismiss

by all Defendants (except Defendant Concord Family Services) be denied in their entirety, together

with such other and further relief as this court may deem just and proper.

Dated: New York, New York
　　　July 31, 2025

/s/Carolyn A. Kubitschek
Carolyn A. Kubitschek
Lansner & Kubitschek
325 Broadway, Suite 203
New York, New York 10007
t: (212) 349-0900
ckubitschek@lanskub.com

/s/Clyde Rastetter
Clyde Rastetter
Kopke Christiana & Rastetter LLP
199 Cook Street, Suite 308
Brooklyn, New York 11206
t: (917) 451-9525
clyde@kcrllp.com

*Attorneys for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

CLYDE RASTETTER, hereby declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

I am one of the attorneys for the Plaintiff herein. I hereby certify that this document

complies with the word-count limitations of Local Civil Rule 7.1(c) because although it exceeds

those limitations and contains 12,523 words, excluding the parts exempted by the Rule, it is

being filed concurrently with a request for permission to exceed said limitations in order to file a

single consolidated and streamlined opposition brief as directed by the Court on a prior occasion

in its September 24, 2024 Order. The number of words has been determined using the word

count function of Microsoft Word 365.

Dated: New York, New York
       July 31, 2025

                                        /s/Clyde Rastetter
                                        Clyde Rastetter
                                        Kopke Christiana & Rastetter LLP
                                        199 Cook Street, Suite 308
                                        Brooklyn, New York 11206
                                        t: (917) 451-9525
                                        clyde@kcrllp.com